UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
PHILOMENA AFFUM                               )
d/b/a Asafo Market,                           )
                                              )
              Plaintiff,                       )
                                              )
       v.                                      )        Civil Action No. 08-300 (RCL)
                                              )
UNITED STATES OF AMERICA                      )
and ED SCHAFER,                               )
                                              )
              Defendants.                      )
_____)

**PLAINTIFF'S APPLICATION FOR STAY OF
ADMINISTRATIVE ACTION AND FOR PRELIMINARY INJUNCTION**

Plaintiff Philomena Affum d/b/a Asafo Market, pursuant to 7 U.S.C. § 2023(a)(17), Fed.

R. Civ. P. 65, and Local Rule 65.1, applies for a stay of administrative action and/or a

preliminary injunction. The grounds for the application are set forth in the accompanying

memorandum. Plaintiff asks that a hearing be set as soon as possible, consistent with the

provisions of Local Rule 65.1(c) and (d). A form of order is attached.

          /s/  Charles B. Wayne
          Charles B. Wayne (#935858)
          DLA Piper US LLP
          500 8th Street, N.W.
          Washington, D.C.  20004
          (202) 799-4000
          (202) 799-5000 (fax)

          *Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
PHILOMENA AFFUM                           )
d/b/a Asafo Market,                       )
                                          )
                  Plaintiff,              )
                                          )
        v.                                )        Civil Action No. 08-300 (RCL)
                                          )
UNITED STATES OF AMERICA                  )
and ED SCHAFER,                           )
                                          )
                  Defendants.             )
_____   )


**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF APPLICATION FOR STAY OF ADMINISTRATIVE
<u>ACTION AND FOR PRELIMINARY INJUNCTION</u>**


Charles B. Wayne (#935858)
DLA Piper US LLP
500 8th Street, N.W.
Washington, D.C.  20004
(202) 799-4000
(202) 799-5000 (fax)

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 2

    A.   The Statutory and Regulatory Scheme as to Trafficking ............................... 3

        1.   The 1988 and 1990 Amendments Conferring Discretion on the Secretary ............ 3

        2.   The Secretary's Implementing Regulations ........................................... 5

    B.   The Administrative Adjudication Process.................................................... 7

    C.   Judicial Review and the 1996 Elimination of the Automatic Stay................ 9

    D.   The Administrative Proceedings Concerning Affum ................................... 10

    E.   Irreparable Injury........................................................................................ 13

PROCEDURAL POSTURE ................................................................................... 13

ARGUMENT ......................................................................................................... 14

I.    AFFUM IS ENTITLED TO THE REQUESTED STAY AND PRELIMINARY
    INJUNCTIVE RELIEF .................................................................................... 14

    A.   Affum Will Be Irreparably Injured if the Stay or Injunctive Relief Does Not
        Issue........................................................................................................... 14

    B.   The Government Will Suffer No Harm if the Stay or Injunctive Relief Is Issued........ 15

    C.   There Is a Substantial Likelihood that Affum Will Succeed on the Merits .................. 16

        1.   The Secretary's Regulations Wrongfully Disqualified Affum from
            Eligibility for a Civil Money Penalty in Lieu of Permanent Disqualification ....... 16

            a.   The Regulations Are in Direct Conflict with the Food Stamp Act ................ 16

            b.   The Regulations are Arbitrary and Capricious Because the Secretary
               Failed to Consider Their Impact on Small Stores ........................................... 20

            c.   The Regulations Violate Affum's Substantive Due Process Rights .............. 22

        2.   The Secretary's Computation of the Civil Money Penalty is Contrary to the
            Statute, Arbitrary, Capricious, and Violative of Affum's Substantive Due
            Process Rights ................................................................................................ 22

D.   The Public Interest Will Be Furthered by the Requested Injunctive Relief .................. 23

II.   AFFUM SHOULD NOT BE REQUIRED TO POST A BOND ......................................... 24

CONCLUSION ........................................................................................................................... 24

## INTRODUCTION

Plaintiff Philomena Affum owns and operates Asafo Market, a food store serving some of the poorest residents of the District of Columbia.  Approximately 90 to 95% of the store's sales are made to customers using food stamp benefits.  Affum's sole employee -- now a former employee -- gave a total of $30 cash back to an undercover agent who had purchased items with an electronic food stamp benefits card, an act that constituted prohibited trafficking.  Affum did not know of, nor did she benefit from, this transaction, but trafficking is governed by a strict liability standard.  Under the Secretary of Agriculture's regulations implementing the Food Stamp Act, the offense -- the first for Affum's store -- was punishable by permanent disqualification from the food stamp program unless Affum could demonstrate that she qualified for an alternative monetary fine called a "civil money penalty."

The Secretary's regulations, however, have onerous documentary and recordkeeping requirements that make it virtually impossible for a small store to qualify for the civil money penalty.  Other federal courts, including the United States Court of Appeals for the Eighth Circuit, have held the Secretary's regulations to be contrary to the Food Stamp Act as well as arbitrary and capricious.  As fully set forth below, this Court should do the same.

Affum's permanent disqualification from the food stamp program took effect immediately upon the issuance of the initial agency decision, which was later rubberstamped "final."  She seeks a stay of the agency action under the Food Stamp Act, which provides for a trial *de novo* and a preliminary stay of the disqualification if she can demonstrate irreparable injury and a likelihood of prevailing on the merits.  She also attacks the regulations directly and, under those counts of the complaint, asks for a preliminary injunction pursuant to Fed. R. Civ. P. 65 and Local Rule 65.1.

Should the requested relief not issue, Affum will go out of business in a very short period of time, long before her claims are finally adjudicated.

## STATEMENT OF FACTS

Affum owns and operates a small food store -- Asafo Market -- in the D.C. Farmer's Market, located at 1309 5th Street, N.E., Washington, D.C.  Affum operates the store by herself, although she had a part-time employee during some of the time material to this action.  Affum Aff. (Ex. 1) ¶¶ 1-2.  As a result of Asafo Market's location near low-income neighborhoods, a substantial percentage of its sales -- 90 to 95% -- is paid for with benefits from the federal food stamp program, which provides assistance to persons below a certain income level.  *Id*.  ¶ 3. Food stamp recipients were formerly issued coupons that could be used to purchase food items. By mid-1998, the use of coupons in the Washington, D.C. metropolitan area was almost entirely replaced by the issuance of electronic benefit cards (automated debit cards) to food stamp recipients.

The buying or selling of food stamp coupons or electronic benefits is known as "trafficking," 7 C.F.R. § 271.2, and is prohibited.  A retail store in the food stamp program violates the Secretary's regulations if it accepts coupons or electronic benefits in exchange for cash.  *Id*. § 278.2(a).  In October 2007, Affum received a letter from the Food and Nutrition Service ("FNS"), the subdivision of the Department of Agriculture that administers the food stamp program.  The letter (Ex. 2), which was dated October 10, 2007, and the enclosed, redacted investigative report charged that an Asafo Market employee had, during February through April 2007, done the following:  (a) on two separate days, gave a total of $30 cash back to an undercover agent who had purchased food with an electronic benefits card, which constituted trafficking; and (b) on six occasions, allowed the purchase of items "obviously ineligible" under the food stamp program in violation of 7 C.F.R. § 278.2(a).  The latter offense

was the less serious of the two, and the range of sanctions depended, in large part, on (a) the participation and/or knowledge of the store's management in the violations; and (b) the degree of care exercised by management in training and supervising the store's employees. *See, e.g.*, 7 C.F.R. § 278.6(e)(4), (5).

With regard to the alleged trafficking, the charging letter did not allege that Affum herself knew of or benefited from the trafficking, nor was the letter required to do so. Under the provisions of the Food Stamp Act, as amended, 7 U.S.C. § 2011 *et seq.*, store owners who are entirely unaware of their employees' unauthorized illegal acts are held strictly liable for those acts and are subject to all applicable penalties. The letter stated that "[b]ecause of the seriousness of these [trafficking] charges, your firm is being considered for PERMANENT disqualification from participation in the [food stamp program] or for the imposition of a Civil Money Penalty . . . ." Ex. 2 at 1.

### A. The Statutory and Regulatory Scheme as to Trafficking

#### 1. The 1988 and 1990 Amendments Conferring Discretion on the Secretary

Beginning in 1982, permanent disqualification was the only punishment available to a store whose employee trafficked in food stamps.[1] Increased trafficking violations prompted Congress to amend the Food Stamp Act and impose this strict policy.[2] The severity of the

---

[1] 7 U.S.C. § 2021(b)(1982).

[2] *See* S. Rep. No. 97-504, at 63, *reprinted in* 1982 U.S.C.C.A.N. (96 Stat.) 1641, 1701. The Secretary then promulgated regulations implementing the policy. *See* 7 C.F.R. § 278.6(e)(1)(i)(1984).

sanction[3] led to a split in the circuit courts as to whether an "innocent owner" -- who did not know of or benefit from the trafficking violation -- could be permanently disqualified.[4]

Congress reconsidered the issue in 1988 and resolved it in favor of a flexible range of sanctions for trafficking to be implemented according to the Secretary's discretion.  Congress added the following to the permanent disqualification penalty contained in 7 U.S.C. § 2021(b)(3)(B):

> . . . except that the Secretary shall have the discretion to impose a civil money penalty of up to $20,000 in lieu of disqualification . . . for . . . trafficking . . . *if the Secretary determines that there is substantial evidence that such store or food concern had an effective policy and program in effect to prevent violations* . . . .[5]

The legislative history of the amendment makes Congress' intent clear:

> *[I]nnocent persons should not be subject to the harsh penalty of disqualification where a store or concern has undertaken and implemented an effective program and policy to prevent violations. The Secretary of Agriculture is directed to promulgate regulations consistent with the described amendment.*

> For example, stores have been permanently disqualified from participation in the food stamp program upon the sale of $13.00 in food stamps for $5.00 in cash -- for the sale of $6.00 in food stamps for $6.00 in cash.  *Under current law, no discretion is provided to the Secretary of Agriculture to evaluate a store's actions to prevent these violations.*

---

[3]    Not only does the store lose customers, but the statute and the regulations impose heavy fines if the store is sold during the disqualification period.  *See* 7 U.S.C. § 2021(e); 7 C.F.R. § 278.6(f)(2).

[4]    *Compare Willy's Grocery v. United States*, 656 F.2d 24, 26-27 (2d Cir. 1981) (rejecting innocent owner defense) *with R Ranch Mkt. Corp. v. United States*, 861 F.2d 236, 239 (9th Cir. 1988) ("[W]e are reluctant to infer that Congress intended to impose a sanction on an unknowing employer absent a clear indication that such was Congress' intent.").

[5]    Hunger Prevention Act of 1988, Pub. L. No. 100-435, § 344, *reprinted in* 1988 U.S.C.C.A.N. (102 Stat.) 1645, 1664 (emphasis added).

> *This provision provides this discretion. The Act will retain strict penalties -- fines can be imposed as well as disqualification from participation in the food stamp program. With Secretarial discretion, we can be assured that the punishment will more closely fit the crime.*[6]

In 1990, Congress once more amended § 2021(b)(3)(B) to require the Secretary to consider evidence of knowledge of the violation by the store's ownership or management.[7] One purpose of these amendments was to "expand[ ] the types of evidence that can be used to show that a fine is more appropriate than permanent disqualification."[8]

### 2. The Secretary's Implementing Regulations

Following the 1988 amendment, the Secretary promulgated interim regulations in May 1989[9] that became final in August 1990.[10] Although the 1988 amendment gave the Secretary significant discretion in determining the appropriate sanction for an innocent owner whose employee engaged in trafficking, he promulgated regulations that (a) created an arduous procedure for innocent owners seeking to benefit from that newly-conferred discretion; and (b) effectively eliminated the Secretary's ability to exercise that discretion. Those regulations, which remain in effect today, require a store accused of trafficking to respond to the charging letter within 10 days of receipt. That response must include (a) all of the store's evidence in

---

[6] H.R. Rep. No. 100-828, at 28 (1988) (emphasis added).

[7] *See* Food, Agriculture, Conservation, and Trade Act of 1990, Pub. L. No. 101-624, § 1743, *reprinted in* 1990 U.S.C.C.A.N. (104 Stat.) 3359, 3795. The provision was also amended to cap the civil money penalty at $40,000 for a single investigation, regardless of the number of trafficking violations. *See id.* (adding $40,000 cap); Mickey Leland Childhood Hunger Relief Act, Pub. L. No. 103-66, § 13943, *reprinted in* 1993 U.S.C.C.A.N. (107 Stat.) 672, 677 (changing two-year period to single investigation).

[8] H.R. Rep. No. 101-916, at 1098 (1990), *reprinted in* 1990 U.S.C.C.A.N. (104 Stat.) 5286, 5623.

[9] 54 Fed. Reg. 18,645 (May 2, 1989).

[10] 55 Fed. Reg. 31,809 (Aug. 6, 1990).

defense of the charges; (b) a request for consideration of a civil money penalty in lieu of permanent disqualification; and (c) evidence that establishes the store's eligibility for a civil money penalty.[11]

Although the 1988 amendment to the statute stated only that "substantial evidence" of the store's policy and program to prevent violations was needed by an innocent owner in order to qualify for the civil money penalty, the regulations created a rigid standard – called "criteria for eligibility" – that the Secretary invariably applies.  A store, regardless of its size, in order to qualify for the civil money penalty, must have the following in place prior to the alleged violation: a "written and dated" policy concerning compliance with the food stamp statute and regulations that reflects (a) the "development and/or continued operation of firm policy and procedures" as to discipline of employees who traffic or commit other violations; and (b) the "development and/or continued operation of procedures for internal review of firm employees' compliance with [food stamp] regulations.[12]

In addition to the written policy described in the preceding paragraph, a store must, prior to the alleged violation, "have developed and implemented an effective training program for all managers and employees" that includes (a) "dated training curricula"; (b) initial and follow-up training sessions for employees and records of the dates of those sessions; (c) contemporaneous documentation of the participation of each employee in the training sessions; and (d) "[w]ritten materials, which may include FNS publications and program regulations."  *Id*. § 278.6(i)(2).

The FNS, however, publishes no materials for stores to use in order to qualify for a civil money penalty in the event of a trafficking charge.  Although the FNS provides retailers with a

---

[11]  7 C.F.R. § 278.6(b)(2)(i)-(iii).

[12]  *Id*. § 278.6(i)(l).

brochure entitled "The Food Stamp Program -- Training Guide for Retailers" (Ex. 3), that publication (also available on the Department of Agriculture website) makes no mention of the "criteria for eligibility."    Affum Aff. ¶ 6.    Nor does the retailer training video on the same website.   There are no official "training curricula," or "written materials," or instructions on how to create and maintain the extensive written records required by the regulations.  *Id.*  Indeed, the FNS does not even notify stores of the "criteria for eligibility," other than by providing a 70-page compilation of regulations excerpted from the Code of Federal Regulations.  *Id.* ¶ 7.   The "criteria" are buried in the 70 pages.   The owner of a store who does not have an in-house lawyer typically learns of the "criteria" when the FNS references them in the charging letter.   By then, however, it is too late.

The regulations' rigid approach extends to the civil money penalty itself.   Even when this monetary sanction is applied, the formula for assessing it is based solely on the store's legitimate food stamp redemptions, and consequently punishes an innocent owner for doing good business. Under this formula, the Secretary applies a series of arithmetic multipliers designed to guarantee that virtually every innocent owner will incur the statutory maximum penalty of $54,000[13] for a first offense.  7 C.F.R. § 278.6(j)(1)-(3).

## B.   The Administrative Adjudication Process

A proceeding against a store owner begins with the charging letter from the FNS regional office with responsibility for the store's geographic area.  7 C.F.R. § 278.6(b)(1).  A redacted version of the investigative report is provided as well.  As stated above, a store owner accused of trafficking is required to provide a response in 10 days that must include (a) all evidence in

---

[13]   The statutory amount of $40,000, *see supra* note 7, was increased to $54,000 by The Federal Civil Penalties Inflation Adjustment Act of 1990, as amended.  *See* 70 Fed. Reg. 29,573, 29,577 (May 24, 2005); 7 C.F.R. §§ 3.91(b)(3)(ii); 278.6(j).

opposition to the charge; (b) a request for a civil money penalty in lieu of permanent disqualification, if the former is desired; and (c) all evidence that establishes the store's eligibility for the civil money penalty. 7 C.F.R. § 278.6(b)(2)(i)-(iii).

The charging letter also directs the store owner to serve his response on -- or, alternatively, to meet with -- the "officer-in-charge," an FNS employee located in an FNS field office that is within the region in question. That officer-in-charge typically makes the initial determination as to whether (a) the alleged violation(s) occurred; (b) the store qualifies for the civil money penalty; and (c) the amount of the civil money penalty, if applicable. The officer-in-charge then sends the store owner a letter setting forth the determination and the sanction. *Id.* § 278.6(c)-(j).

Although the Secretary's regulations require that the FNS regional office -- or its agent, the officer-in-charge -- "review" all of the available evidence, *id.* § 278.6(c), the process cannot be fairly characterized as an evaluation of the evidence by a disinterested arbiter. Upon information and belief, the officer-in-charge generally relies on the investigative report and finds that a violation occurred.

Once a trafficking violation is found, the officer-in-charge has no discretion whatsoever in the choice of sanction. The civil money penalty, which may be substituted for permanent disqualification, is available only to those store owners who, prior to the alleged violation, had in place, as described above, an exceedingly formal training program and written materials, and extensive, contemporaneous records of such a program. In real terms, this requirement makes the civil money penalty available only to chain stores and other concerns large enough to employ in-house counsel or outside general counsel.

In trafficking cases, therefore, the officer-in-charge/regional office level yields a predetermined result. The next level -- the Administrative Review Branch -- is no different. An employee in that branch -- generally called an administrative review officer -- makes the final agency decision. 7 U.S.C. § 2023(a)(5); 7 C.F.R. § 279.1 *et seq*. The Secretary's regulations give the administrative review officer no more discretion in trafficking cases than that accorded the officer-in-charge.

### C.   Judicial Review and the 1996 Elimination of the Automatic Stay

Until 1996, the lack of a meaningful administrative adjudication process posed no problem to an innocent owner charged with trafficking. The Food Stamp Act and the Secretary's regulations provided that the decision reached and penalty imposed by the regional office (the first stage of the process) would be automatically stayed upon a request for administrative review. 7 U.S.C. § 2023(a) (1996); 7 C.F.R. § 278.8(a) (1995). As a result of the automatic stay, the administrative decisions, both initial and final, had no impact on a store charged with trafficking until the administrative adjudication process had been completed. The decision of the administrative review officer became effective 30 days after receipt by the store. 7 U.S.C. § 2023(a) (1996); 7 C.F.R. § 279.8(g) (1995).

Within that 30-day period, however, the store could obtain *de novo* judicial review of the administrative decision by filing a complaint in a United States District Court or an appropriate state court. 7 U.S.C. § 2023(a) (1996). That action was "a trial *de novo* . . . in which the court shall determine the validity of the questioned administrative action in issue." *Id*. Moreover, the court was given great discretion with regard to the appropriate remedy: "If the court determines that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence." *Id*. The statute also specifically gave the court the power to stay the administrative action until conclusion of the trial or appeal, upon a showing by

the store of (a) irreparable injury if no stay would issue; and (b) a likelihood of success on the merits. *Id.*

That judicial review procedure remains in place today with one critical exception: on August 22, 1996, Congress amended 7 U.S.C. § 2023(a)[14] by eliminating the automatic stay in all cases in which permanent disqualification is administratively imposed, including trafficking. The amendment also (a) made the permanent disqualification effective immediately, i.e., upon receipt of notice from the FNS regional office, 7 U.S.C. § 2023(a)(1); and (b) conferred immunity on the Secretary if the decision to permanently disqualify a store was later found to be erroneous by the administrative review officer or by a court: "If the disqualification is reversed through administrative or judicial review, the Secretary shall not be liable for the value of any sales lost during the disqualification period." *Id.* (18).

With the elimination of the automatic stay for trafficking cases and the immediate effect of the regional office's decision to permanently disqualify, the innocent owner now feels acutely the deficiencies in the administrative process as implemented by the Secretary's regulations.

**D.   The Administrative Proceedings Concerning Affum**

After receiving the October 10, 2007 charging letter, Affum opted to meet with the officer-in-charge in lieu of a written response (as the letter stated), and did so on November 5. Affum Aff. ¶ 4.  Affum had no basis to contest the charges, and told the officer-in-charge that her employee had admitted the alleged conduct.  Affum also told the officer-in-charge that the store employee had been trained and that the employee knew that it was prohibited to (a) exchange cash for food stamp benefits; and (b) to accept food stamp benefits for ineligible

---

[14]   Personal Responsibility and Work Opportunity Reconciliation Act of 1996, H.R. 3734, Pub. L. No. 104-193, § 845, *reprinted in* 1996 U.S.C.C.A.N. (110 Stat.) 2105, 2333.

items.  Affum had terminated the employee and so informed the officer-in-charge.  *Id*.  With the

regard to the possible penalties, Affum's understanding -- from the October 10 letter, prior to the

November 5 meeting -- was that there were three possible penalties:  permanent disqualification,

a six-month disqualification, or a fine that could be as much as $54,000.  *Id*.  Affum did not

discuss the possible penalties with the officer-in-charge.   Rather, the officer-in-charge told

Affum to "tell [her] side of the story" and that "they [the Department of Agriculture] would

decide what to do."  *Id*.

On November 14, the FNS regional office, through the officer-in-charge, issued its

decision in letter form.  The regional office found that (a) the trafficking violations occurred; (b)

Affum was not eligible for the civil money penalty because she "failed to submit sufficient

evidence to demonstrate that [her business] had established and implemented an effective

compliance policy and program to prevent violations of the Food Stamp Program"; and (c)

Affum was "permanently disqualified from the Food Stamp Program, effective upon receipt of

this letter[,] . . . in accordance with [7 C.F.R. §§] 278.6(c) and 278.6(e)(1) . . . ." Ex. 4 at 1.  The

November 14 regional office decision did not address the charges that ineligible items had been

purchased with electronic benefits other than the general statement that "[w]e find that [all] the

violations cited in our charge letter occurred at your firm."  *Id*.

Affum submitted a timely request for review of the regional office decision, which was

received by the FNS Administrative Review Branch on November 26.  Exs. 5, 6.  By letter dated

December 26, 2007, Affum further stated her position, explaining, *inter alia*, that the employee

"who was responsible for this great error was informed from the very beginning that the

[electronic food stamp benefits were] strictly for use with food items only and nothing else."  Ex.

7 at 1.  Affum further stated:

As a result [of being prohibited from accepting food stamp benefits] it has become increasingly more difficult to sustain my store; with very large loans, rent, and very little business income from lack of [food stamp revenue], I am in danger of losing everything.  As a new business, which just started last year, my family has worked hard and has put everything into trying to make it a success.  In trying to make the store a success I have tried to conduct business honorably and honestly.  It seems that in this instance, a mistake was made.  Asafo Market had no intention in abusing or taking advantage of the privilege [of participating in] the Food Stamp Program.  I can wholeheartedly say that my helper who made this error and myself who is responsible, are deeply sorry and have paid dearly for what has occurred.  We have learned from this experience and understand the seriousness of what has occurred.

I humbly yet imploringly ask that you grant me and my store, Asafo Market, a second chance.  As of now, all that I have worked and sacrificed is a failure, but with another opportunity to right this wrong, it can be turned into a success.  If you grant Asafo Market the privilege of using the Food Stamp Program ever again, I promise that that misuse of the [food stamp benefits] will never happen again.  In addition, the helper who directly misused the [food stamp benefits] is no longer there, based on her own decision, which means she will not be present to make the same mistake again if granted that privilege again.  I cannot express enough how sorry I am and how important the Food Stamp Program is to the store's survival.  Please give Asafo Market another chance at life.  Thank you.

*Id*. at 1-2.

Consistent with the FNS practice and procedure, the administrative review officer affirmed the regional office's finding as to the trafficking violation and affirmed the sanction of permanent disqualification.  As to the ineligible items charges, the administrative review officer generally affirmed the regional office finding that such violations occurred, but did not address the issue of punishment.  Ex. 8 at 4.  The administrative review officer's affirmance constituted the final agency decision.  *Id*. at 1.

Affum received the final agency decision on January 23, 2008, *see* Ex. 9, and timely filed this action, in part, as an action for judicial review of the Secretary's action under 7 U.S.C. § 2023(a)(13)-(17).

**E.   Irreparable Injury**

As discussed above, 90-95% of Asafo Market's gross receipts are attributable to customers who use food stamp benefits. Affum Aff. ¶ 3. Since being disqualified from participation in the food stamp program, Affum's business has operated at a significant loss. *Id.* Permanent disqualification will force Affum out of business, as will the lack of injunctive relief during the pendency of this action. *Id.*

**PROCEDURAL POSTURE**

Affum has two primary bases for this action. First, under 7 U.S.C. § 2023(a)(13)-(17), part of the Food Stamp Act, Affum is entitled to a "trial de novo" in this Court. *Id.* (15). In this proceeding, the Court "shall determine the validity of the questioned administrative action in issue . . . ." *Id.* Should the Court conclude "that such administrative action is invalid, it shall enter such judgment or order as it determines is in accordance with the law and the evidence." *Id.* (16). Affum's challenge in this regard is not as to the fact-finding conducted by the Secretary's delegates -- she does not contest that the alleged acts by her employee occurred -- but rather that the administrative action is "invalid" because, as set forth below, it (1) is based on the Secretary's regulations; and (2) those regulations are contrary to the Food Stamp Act's provisions, violate the Fifth Amendment's due process guarantee, and are arbitrary, capricious, and otherwise contrary to law.[15]

---

[15] *See Freedman v. United States Dep't of Agric.*, 926 F.2d 252, 261 (3d Cir. 1991) ("[7 U.S.C. § 2023] requires the district court to examine the entire range of issues raised . . . ."); *Modica*

(footnote continued)

As such, Affum's claim under the Food Stamp Act judicial review provision (count one of the complaint) is essentially co-extensive with her direct challenge to the Secretary's regulations (counts two and three). There is, however, a difference in the standard to be used by the Court in considering this application, as between (a) count one and (b) counts two and three. Under 7 U.S.C. § 2023(a)(17), the Court is to issue a stay of the administrative action upon an applicant's showing of (1) "irreparable injury" and (2) "a likelihood of prevailing on the merits." Under the familiar Rule 65 preliminary injunction standard that would apply to Affum's direct challenge to the regulations, she would also have to demonstrate that a preliminary injunction would not substantially injure other interested parties and that the public interest would be furthered by the injunction. *E.g., Omar v. Harvey*, 479 F.3d 1, 18 (D.C. Cir. 2007).

Affum can carry her burden under both 7 U.S.C. § 2023(17) and Rule 65.

## ARGUMENT

### I. AFFUM IS ENTITLED TO THE REQUESTED STAY AND PRELIMINARY INJUNCTIVE RELIEF.

#### A. Affum Will Be Irreparably Injured if the Stay or Injunctive Relief Does Not Issue.

Affum's affidavit states that (1) 90-95% of Asafo Market's gross receipts is derived food stamp purchases; (2) as a result of the disqualification, the market has operated at a significant loss; (3) a denial of the stay and injunctive relief during the pendency of this action will force Affum out of business. Affum Aff. ¶ 3.

---

*v. United States*, 518 F.2d 374, 376 (5th Cir. 1975) ("The trial *de novo* provision of [7 U.S.C. § 2023] is clearly broader than the review standard provided for under the Administrative Procedure Act. It requires the district court to examine the entire range of issues raised, and not merely to determine whether the administrative findings are supported by substantial evidence.").

It is well-established in this Circuit that "economic loss may constitute irreparable harm where the loss threatens the very existence of the movant's business." *World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 67 (D.D.C. 2000) (Lamberth, J.) (citing *Wisconsin Gas v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  *See also Ajilon Professional Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, 362 (D.D.C. 2007) (same).  That situation is certainly present here, where 90-95% of Asafo Market's sales is food-stamp related, and Affum has represented that she will be forced out of business absent the requested relief.

Other courts that have considered similar motions for injunctive relief in the *de novo* review of the Secretary's determination under 7 U.S.C. § 2023(a)(17) have also found irreparable harm where a significantly smaller percentage of sales have been lost.  *E.g., Lazard v. United States Dep't of Agric.*, 186 F. Supp. 2d 1203, 1214 (M.D. Fla. 2001) (loss of 40.5% of business); *Castillo v. United States*, 989 F. Supp. 413, 417 (D. Conn. 1997) (loss of 45% and representation that store will be forced to cease operation); *Kim v. United States*, 822 F. Supp. 107, 110-11 (E.D.N.Y. 1993) (30% loss and same representation).  *See also World Duty Free Americas*, 94 F. Supp. at 67 (29% loss, with other facts, sufficient to constitute irreparable harm).

Affum has satisfied this element of both standards.

### B.   The Government Will Suffer No Harm if the Stay or Injunctive Relief Is Issued.

The Secretary cannot credibly claim that the government will suffer harm if the status quo ante is restored.  The offending employee is no longer employed by the store, Affum Aff. ¶ 4, and there is no reason to believe that the conduct in issue will be repeated.  To the contrary, during the pendency of this litigation, Affum has every incentive to ensure that no violations occur.

**C.  There Is a Substantial Likelihood that Affum Will Succeed on the Merits.**

Whether this element is described as "a likelihood of prevailing on the merits" (as in 7 U.S.C. § 2023(a)(17)) or as "a substantial likelihood of success on the merits" (in the wording of this Circuit's decisions), Affum carries her burden.

**1.  The Secretary's Regulations Wrongfully Disqualified Affum from Eligibility for a Civil Money Penalty in Lieu of Permanent Disqualification.**

The Secretary's determination that Affum was not eligible for a civil money penalty in lieu of disqualification is invalid as a matter of law for three reasons:  (a) the Secretary's regulations setting forth eligibility requirements for the civil money penalty are in direct conflict with the Food Stamp Act and must be rejected; (b) the regulations are arbitrary and capricious because the Secretary failed to consider their negative impact on small stores; and (c) the regulations violate Affum's substantive due process rights guaranteed by the Fifth Amendment, for the regulations are not sufficiently related to any legitimate state interest and are gravely unfair.

**a.  The Regulations Are in Direct Conflict with the Food Stamp Act.**

As discussed above, the 1988 and 1990 amendments to the Food Stamp Act afforded an innocent owner charged with trafficking the possibility of a civil money penalty instead of permanent disqualification if he or she could produce "substantial evidence" of an effective policy and program in place to prevent such violations.  7 U.S.C. § 2021(b)(3)(B).  In the administrative law context, "'[s]ubstantial evidence' means more than a 'scintilla,' but less than a preponderance of the evidence."  *Wisconsin Power & Light Co. v. FERC*, 363 F.3d 453, 461 (D.C. Cir. 2004) (quoting *Burns v. Director, Office of Workers' Comp*., 41 F.3d 1555, 1562 n.10 (D.C. Cir. 1994)).  Otherwise stated, substantial evidence is such "relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," even when "a plausible

alternative interpretation of the evidence would support a contrary view." *Secretary of Labor v. Federal Mine Safety & Health Review Comm'n*, 111 F.3d 913, 918 (D.C. Cir. 1997).

Regardless of which formulation is used, it is plain that the Secretary's regulations are in direct conflict with the 1988 and 1990 amendments. There is absolutely no flexibility in those regulations, as an innocent owner's evidence, in the Secretary's view, *must*[16] include the following or it is not "substantial evidence":

- a "written and dated" policy concerning compliance with the food stamp program and regulations that reflects (a) the "development and/or continued operation of firm policy and procedures" as to discipline of employees who traffic or commit other violations; and (b) the "development and/or continued operation of procedures for internal review of firm employees' compliance with [food stamp] regulations"[17];

- "dated training curricula"[18];

- initial and follow-up training sessions for employees and records of the dates of those sessions[19];

- contemporaneous documentation of each employee in the training sessions[20]; and

- "[w]ritten materials, which may include FNS publications and program regulations."[21]

---

[16] "[T]he firm shall, at a minimum, establish by substantial evidence its fulfillment of each of the following criteria . . . ." 7 C.F.R. § 278.6(i).

[17] 7 C.F.R. § 278.6(i)(1).

[18] *Id*. 278.6(i)(2).

[19] *Id*.

[20] *Id*.

[21] *Id*.

These unyielding requirements[22] are in direct conflict with the well-established definition of substantial evidence as well as Congress' intent to provide the Secretary broad discretion to make sure "that the punishment will more closely fit the crime"[23] and to "expand[ ] the types of evidence that can be used to show that a fine is more appropriate than permanent disqualification."[24]

The Secretary's regulations on this point and, more generally, "reflect a reluctant or hostile attitude toward the alternative monetary sanction," i.e., the civil money penalty. *Ghattas v. United States*, 40 F.3d 281, 284 (8th Cir. 1994). In *Ghattas*, the Eighth Circuit engaged in the most thorough reported analysis of the regulations and found them contrary to both the 1988 and 1990 amendments to § 2021(b)(3)(B). *Id*. at 284-86. With regard to the innocent owner before it, the Eighth Circuit held that the Secretary "has improperly applied [his] procedural regulations to abdicate [his] responsibility to exercise the discretion Congress has delegated." *Id*. at 287.

---

[22]   In *Castillo v. United States*, 989 F. Supp. 413 (D. Conn. 1997), an otherwise well-reasoned decision, the court mistakenly found some wiggle room in the regulations and stated that "[t]he regulations and prior practice suggest that FCS adapts its stringent regulations in a manner which will take into account the differences between small convenience stores and supermarket chains." *Id*. at 418. In support of the "prior practice" point, the *Castillo* court cites *Freedman v. United States Dep't of Agric*., 926 F.2d 252 (3d Cir. 1991), stating that the FCS in that case accepted affidavits in lieu of the required documentation and granted a civil money penalty. 989 F. Supp. at 418. Although that statement is accurate, it ignores the context of *Freedman*: the FCS action occurred in September 1989, 926 F.2d at 254, at a time that the interim regulations had been in effect for approximately five months. *See supra* notes 9 & 10 and accompanying text. For whatever reason, it is clear from *Freedman* that the FCS office in question was not operating under the interim regulations. *See* 926 F.2d at 254. Another district court decision follows *Castillo* on this point. *See Ahmed v. United States*, 47 F. Supp. 2d 389, 396 (W.D.N.Y. 1999). Both *Castillo* and *Ahmed* held that the Secretary violated his own regulations by failing to take evidence into account other than that specified in the regulations. 989 F. Supp. at 418-19; 47 F. Supp. 2d at 396-97. Should this Court adopt this view of the regulations, Affum should prevail as did the plaintiffs in *Castillo* and *Ahmed*.

[23]   H.R. Rep. No. 100-828, *supra* note 6, at 28.

[24]   H.R. Rep. No. 101-916, *supra* note 8, at 1098.

The same is true in this case and every case in which the Secretary rejects the civil money penalty because an innocent owner did not have the documentation required by the regulations. The regulations gut the meaning of "substantial evidence," the flexible standard that Congress chose. As such, the court must invalidate those regulations, for they are not "consistent with the statute under which they are promulgated." *United States v. Larianoff*, 431 U.S. 864, 873 (1977). *See also Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n.9 (1984) (collecting cases) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."); *World Duty Free Americas*, 94 F. Supp. 2d at 65-66 (preliminarily enjoining agency regulations in conflict with enabling legislation). And where, as here, the agency has run afoul of its statutory mandate, its interpretation is entitled to no deference. *E.g., MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 229 (1994).

In particular, courts have not hesitated to strike down a regulation containing a definition where, as here, that definition is at odds with the enabling legislation. For example, in *Public Employees Retirement System v. Betts*, 492 U.S. 158, 171 (1989), the Supreme Court rejected the Department of Labor's regulation defining "subterfuge" because it "cannot be squared with the plain language of the statute [i.e., the Age Discrimination in Employment Act]." Similarly, the Supreme Court rejected the Federal Reserve Board's definition of "demand deposit" because it was "not an accurate or reasonable interpretation" of the statute under which it was promulgated. *Board of Governors of the Federal Reserve System v. Dimension Fin. Corp.*, 474 U.S. 361, 368 (1986). The Secretary's definition of "substantial evidence" should meet the same fate.

    **b.   The Regulations are Arbitrary and Capricious Because the Secretary Failed to Consider Their Impact on Small Stores.**

It is no surprise that Affum could not satisfy the Secretary's definition of "substantial evidence."  As the Eighth Circuit stated in *Ghattas*, "[t]hese elaborate requirements may be appropriate to measure the compliance efforts of a two-hundred-store supermarket chain.  They seem unsuitable for a one-clerk store in a low income trade area."  40 F.3d at 285.  *See also Ahmed v. United States*, 47 F. Supp. 2d 389, 397 (W.D.N.Y. 1999) ("The proof necessary to establish such a program is onerous and unrealistic when applied to a small business with only one or two employees.").

*Ghattas* held that the entire regulatory regime, not only the unrealistic, burdensome policy and training documentation requirements, "dramatically skew[s] the administrative process to the disadvantage of small business."  40 F.3d at 286.  The court's holding as to the unnecessarily short 10-day response period is equally applicable to the documentation requirements:  "[T]his [regulation] is arbitrary and capricious in that the agency 'entirely failed to consider an important aspect of the problem.'"  *Id*. at 286 (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

Moreover, the Secretary, with regard to small stores, has, through his regulations, effectively refused to exercise the discretion that Congress expressly gave him.  The documentation requirements virtually ensure that a small store owner will never qualify for a civil money penalty and, thus, never trigger the exercise of the secretarial discretion contemplated by Congress.  The Secretary's effective refusal to exercise discretion as to this significant class of owners is arbitrary and capricious as well.  An agency's "failure to so exercise its discretion, when properly called upon to do so, is subject to judicial review for arbitrariness and capriciousness."  *Wolfe v. Marsh*, 835 F.2d 354, 358 (D.C. Cir. 1987).  *See also*

*Succar v. Ashcroft*, 394 F.3d 8, 29 (1st Cir. 2005) ("[T]he Attorney General cannot categorically refuse to exercise discretion favorably for classes deemed eligible by the [permanent resident alien] statute.").

The harm worked on small store owners by the regulations is exacerbated by the failure of the Secretary to inform those owners of what is required in order to avoid permanent disqualification for a single act of trafficking by an employee. Affum was never told by the FNS that (1) she would be strictly liable if an employee, without her consent or knowledge, trafficked in food stamp benefits; (2) the penalty for a first offense was permanent disqualification unless she was eligible for a civil money penalty; and (3) eligibility required satisfaction of certain criteria, including a written policy and training materials and records that could only be written by a lawyer or with the substantial assistance of one. Affum Aff. ¶ 5. There is no reason to believe that her experience is not universal for small store owners entering the program. *See Ahmed*, 47 F. Supp. 2d at 397-98 (agency counsel could point to no FNS communications concerning eligibility for the civil money penalty other than the regulations).

Given the lack of communication, it is not surprising that the Secretary publishes no materials for stores to use to satisfy the so-called "criteria for eligibility." Affum Aff. ¶ 6. Those FNS publications for retailers that do exist -- both in writing and on the Department of Agriculture website -- make no mention of these requirements. *Id*. Affum, like all other owners entering the program, was given a 70-page booklet of regulations with no explanation. *See Ahmed*, 47 F. Supp. 2d at 397-98; Affum Aff. ¶ 7. The information that she needed -- and could only understand with the help of a lawyer -- was buried in the 70 pages. Affum Aff. ¶ 7.

The regulations governing eligibility for the civil money penalty are arbitrary and capricious when applied to small store owners, and may not stand.

### c.   The Regulations Violate Affum's Substantive Due Process Rights.

"Substantive due process 'prevents governmental power from being used for . . . action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests.'" *Washington Teachers Union Local #6 v. Board of Educ. of District of Columbia*, 109 F.3d 774, 781 (D.C. Cir. 1997) (quoting *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 943-44 (D.C. Cir. 1988)). In this Circuit, a plaintiff alleging a substantive due process violation must show "grave unfairness" by government officials. *Tri County Indus., Inc. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997). "Grave unfairness" includes "'a deliberate flouting of the law that trammels significant personal or property rights . . . .'" *Id.* (quoting *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988)).

In this case, the Secretary's conduct qualifies as "gravely unfair." As discussed above, his regulations are not only contrary to the statute, they also discriminate against the small store owner who, for the most part, is even unaware of the regulations until it is too late. Under the circumstances, detailed above, this deprivation rises to the level of a violation of Affum's Fifth Amendment rights.

### 2.   The Secretary's Computation of the Civil Money Penalty is Contrary to the Statute, Arbitrary, Capricious, and Violative of Affum's Substantive Due Process Rights.

In *Corder v. United States*, 107 F.3d 595 (8th Cir. 1997), the Eighth Circuit found the civil money penalty computation formula contained in the regulations to be contrary to the statute as well. Using the same analysis as in *Ghattas*, the Eighth Circuit held:

- The only variable in the formula is the store's average monthly food stamp redemption. The formula "then applies a series of arithmetic multipliers designed, as best we can determine, to guarantee that

nearly every *unknowing first offender* will incur the statutory maximum [$54,000[25]] penalty."[26]

- "This [formula] is not the exercise of informed agency discretion. It is another example of implementing regulations that reflect a hostile attitude toward the alternative monetary sanction Congress enacted in 1988."[27]

- The Secretary should have followed Congress' direction to make "the punishment more closely fit the crime" and "follow principles of fairness that Congress has more clearly delineated in other laws administered by [the Secretary], such as the Packers and Stockyards Act, 7 U.S.C. § 213(b)," which takes into account (1) the gravity of the offense, (2) the size of the business involved, and (3) the person's ability to pay.[28]

- "We conclude that a fine based entirely on this formula . . . must be overturned as arbitrary, capricious, and contrary to the statute."[29]

The Eighth Circuit's analysis is as correct in *Corder* as it is in *Ghattas*. Moreover, for the reasons stated above, the civil money penalty computation regulations violate Affum's substantive due process rights. Affum should prevail on her claim.

### D.   The Public Interest Will Be Furthered by the Requested Injunctive Relief.

If the preliminary injunction is not granted, the Asafo Market will go out of business. The loss of such a business in a chronically under-served part of the District is definitely not in the public interest, particularly where its owner is herself accused of no wrongful conduct. The

---

[25]   *See supra* note 13.

[26]   107 F.3d at 598 (emphasis in original).

[27]   *Id*.

[28]   *Id*.

[29]   *Id. See also Coalition of New York State Carrier Schools, Inc. v. Riley*, 894 F. Supp 567, 572 (N.D.N.Y. 1995) (enjoining Secretary of Education from using refund formula regulations held to be contrary to enabling legislation).

strict liability regime that is rigidly applied by the Secretary, without the discretion that Congress instructed him to use, is most definitely not in the public interest.

## II.    AFFUM SHOULD NOT BE REQUIRED TO POST A BOND.

A trial court has "broad discretion . . . to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).  A nominal bond, or even no bond, is within the court's discretion.  *E.g.*, *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 838 n.42 (D.C. Cir. 1984) ($100 injunction bond was not an abuse of discretion); *Citizen's Alert Regarding the Environment v. United States Dep't of Justice*, 1995 WL 748246, at *12 & n.10 (D.D.C. 1995) ("The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all."); *Armstrong v. Bush*, 807 F. Supp. 816, 823 (D.D.C. 1992) (requiring FOIA plaintiffs to post a nominal $100 bond to secure a TRO).

Affum has limited resources, and what she has are being sapped by this fight for survival. No bond or a nominal bond is appropriate here, particularly where there is no danger that the Secretary will suffer any monetary loss.  *See* 7 U.S.C. § 2023(a)(1)(18).

## CONCLUSION

For all the foregoing reasons, this Court should issue a stay pursuant to 7 U.S.C. § 2023(a)(17) and/or a preliminary injunction pursuant to Rule 65 and Local Rule 65.1, and Affum should not be required to post a bond.

  /s/  Charles B. Wayne
Charles B. Wayne (#935858)
DLA Piper US LLP
500 8th Street, N.W.
Washington, D.C.  20004
(202) 799-4000
(202) 799-5000 (fax)

*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day 20th of March, 2008, I caused Plaintiff's Application for

Stay of Administrative Action and for Preliminary Injunction, Memorandum in Support, and

proposed order to be served, by the Court's electronic case filing system, on:

> Harry B. Roback
> Assistant U.S. Attorney
> Civil Division
> 501 Third Street, N.W.
> Washington, D.C.  20530

>                                                        /s/  Charles B. Wayne
>                                                       Charles B. Wayne

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PHILOMENA AFFUM | ) | |
| d/b/a Asafo Market, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-300 (RCL) |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| and ED SCHAFER, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF PHILOMENA AFFUM

Philomena Affum deposes and says:

1.    I am the owner and operator of Asafo Market, which is located in the D.C. Farmer's Market, 1309 5th Street, N.E., Washington, D.C. 20002. My store has been in business since 2006.

2.    I operate the store by myself, although, in the past, I had a part-time employee assisting me.

3.    My store participated in the food stamp program from the time that it first opened. Approximately 90-95% of the store's sales are paid with food stamp benefits. Since being disqualified from participation in the food stamp program, the store has operated at a significant loss. Permanent disqualification will force me out of business. If the requested injunctive relief is not granted while this lawsuit proceeds, I will be forced out of business as well.

4.    After receiving the October 10, 2007 charging letter from the Department of Agriculture, I chose to meet with the officer-in-charge instead of a written response (as the letter



stated), and did so on November 5. I had no basis to contest the charges, and told the officer-in-charge, Sarah Duncan, that my employee had admitted the alleged conduct. I also told Ms. Duncan that the store employee had been trained and that the employee knew that it was prohibited to (a) exchange cash for food stamp benefits; and (b) to accept food stamp benefits for ineligible items. I had terminated the employee and told that to Ms. Duncan. With the regard to the possible penalties, my understanding -- from the October 10 letter, prior to the November 5 meeting -- was that there were three options: permanent disqualification, a six-month disqualification, or a fine that could be as much as $54,000. I did not discuss the possible penalties with Ms. Duncan. Rather, Ms. Duncan told me to "tell [my] side of the story" and that "they would decide what to do."

5.    Until I received the charging letter, went through the administrative process, and ultimately retained counsel to bring this action, I was totally unaware that in the view of the Department of Agriculture: (a) Asafo Market and I were strictly liable if an employee, without my consent or knowledge, trafficked in food stamps; (b) the penalty for a first offense was permanent disqualification from the program unless I satisfied certain "criteria for eligibility" for a fine called a "civil money penalty"; and (c) satisfaction of that criteria required a written policy and training materials and records that could only be written by a lawyer or with the substantial assistance of a lawyer. The Department of Agriculture never notified me of such penalties or requirements and never provided me with any written materials that would have assisted me in achieving compliance.

6.    To the best of my knowledge, the Department of Agriculture publishes no materials for stores to use in order to qualify for a "civil money penalty" in the event of a trafficking charge. Although the Department of Agriculture provides retailers with a brochure entitled "The

Food Stamp Program -- Training Guide for Retailers," that publication (also available on the Department of Agriculture website) makes no mention of the "criteria for eligibility." Nor does the retailer training video on the same website. To my knowledge, there are no official "training curricula," or "written materials," or instructions on how to create and maintain the extensive written records required by the regulations.

7.    The Department of Agriculture did not notify me of the "criteria for eligibility," other than by providing a 70-page booklet of regulations that I now understand came from the Code of Federal Regulations. The "criteria," I now understand, are buried in the 70 pages. I had no knowledge of this "criteria" until I retained counsel in connection with this lawsuit.

In accordance with 28 U.S.C. § 1746, I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

March 20, 2008

PHILOMENA AFFUM

3

**USDA** United States Department of Agriculture
**Food and Nutrition Service**

United States
Department of
Agriculture

Food and
Nutrition Service

Mid-Atlantic Region

Towson
Field Office

515 E. Joppa Road
Suite 208
Towson, MD
21286-5418

410-779-7097

October 10, 2007

Philomena Affum, Owner
Asafo Market
1309 Fifth Street NE
Stand Numbers 39 AND 40
Washington DC 20002

Dear Mrs. Affum:

United States Department of Agriculture (USDA) investigators have investigated your firm. A copy of the investigative report is enclosed. From this investigation there is evidence that certain violations of the regulations governing the Food Stamp Program (FSP), Title 7 Code of Federal Regulations (CFR) Parts 271-279 (hereinafter also referred to as the regulations), have occurred in your firm.

Based on the transactions which occurred during this investigation, you, doing business as Asafo Market, are charged with conducting Electronic Benefit Transfer (EBT) transactions in exchange for cash (trafficking). The acceptance of a total of $30.00 in food stamp benefits in exchange for a total of $30.00 in cash, as described in Exhibits G and H of the enclosed investigative report, was in violation of Sections 278.2(a) and Section 271.2 of the regulations. Because of the seriousness of these charges, your firm is being considered for PERMANENT disqualification from participation in the FSP or for the imposition of a Civil Money Penalty (CMP).

The names of the persons who conducted and/or were involved in the investigation have been removed. This information is exempt from release under Title 5 United States Code (USC) 552(b)(6) and 552(b)(7)(C) of The Freedom of Information Act (FOIA), since disclosure of such information would result in a clearly unwarranted invasion of personal privacy. In addition, the names and any identifying particulars of the persons who assisted in the investigation as private citizens, and who qualified as confidential sources, are also exempt from release under Title 5 USC 552(b)(7)(D) of the FOIA.

Your firm is liable for the trafficking violations (buying or selling of coupons, ATP cards, or other benefit instruments for cash or consideration other than eligible food) as described in Exhibits G and H of the enclosed investigative report. The sanction for this violation, as provided by Section 278.6(e)(1)(i) of the regulations, is PERMANENT disqualification.

The Food and Nutrition Service is an agency
of the Department of Agriculture

An Equal Opportunity Provider and Employer



EXHIBIT

2

You, doing business as Asafo Market, are also being charged with conducting EBT transactions in exchange for merchandise which, in addition to eligible food items, included obviously ineligible items. These transactions, which are described in Exhibits A, B, C, D, E and F of the enclosed investigative report, were in violation of Section 278.2(a) of the FSP regulations.

Under the provisions of Section 278.6(e)(5) of the enclosed FSP regulations, the aforementioned sale of ineligible items warrants a disqualification period of **SIX MONTHS**.

However, Section 278.6(f) of the FSP regulations allows the Food and Nutrition Service (FNS), under certain conditions, to impose a CMP in lieu of **PERMANENT** disqualification of a firm for trafficking. There is a $54,000.00 limit on the CMP, as authorized under Section 12(b)(3)(b) of the Food Stamp Act of 1977, as amended. In order for you to be eligible for this CMP there must be substantial evidence that your firm had an effective policy and program in effect to prevent violations. Specific criteria for establishing that such a program exists are detailed in Section 278.6(f) of the enclosed regulations. You must meet each of the four (04) criteria listed and are required to provide the documentation as specified.

You must submit your request for a CMP, as well as the required documentation, to: Sarah A. Duncan, Officer-In-Charge (OIC), USDA, FNS, Towson Field Office (TFO), 515 E. Joppa Road, Suite 208, Towson, MD. 21286 within ten days of your receipt of this letter in order to be eligible for consideration. If your request and the required documentation are not submitted timely you will lose your right for any further consideration for a CMP.

If it is determined that you qualify for a CMP, the amount of that penalty will be $54,000.00, which you will be required to pay in full within 30 days of your receipt of the demand for payment. The CMP imposed against you was calculated in accordance with Section 278.6(j) of the regulations. If you are not eligible for a CMP, or if you are eligible, but do not submit the full payment within the required time, the penalty would be **PERMANENT** disqualification for the acceptance of food stamp benefits for cash (trafficking) as described in Exhibits G and H of the enclosed investigative report.

If you meet all the conditions for a CMP in lieu of **PERMANENT** disqualification, you would still be subject to serving the **SIX MONTH** disqualification for the aforementioned sale of ineligible items.

In addition to applying for a CMP, if you so elect, you may present any information, explanation, or evidence regarding the trafficking violations described above. This information must also be provided to the OIC within ten days of your receipt of this letter. You may respond in writing or in person. If you wish to reply in person, please telephone the OIC at 410-779-7097 for an appointment.

We will fully consider your reply and any documentation you provide before we make a final decision in this matter. However, if we do not hear from you within the time indicated, we will make a decision based on the information available to us and advise you of the decision in writing. Section 278.6 of the enclosed regulations spells out the procedures we will follow in making a decision in this case.

If it is determined that the trafficking violations described above did, in fact, occur at your firm and (1) you did not request consideration for a CMP or (2) you were determined to be ineligible for a CMP, Section 14(a) of the Food Stamp Act, as amended, provides that the PERMANENT disqualification of your firm shall be effective on the date of receipt of the letter informing you of our final decision. Therefore, if the PERMANENT disqualification of your firm is later reversed through administrative or judicial review, the USDA shall not be liable for the value of any sales lost during the period of disqualification you served.

Sincerely,

SARAH A. DUNCAN
Officer in Charge
Towson Field Office

File No.: TR-25611

Enclosures

| US DEPARTMENT OF AGRICULTURE - FOOD AND NUTRITION SERVICE | EXHIBIT | A |
|---|---|---|
| **TRANSACTION REPORT** | PAGE | 1 |

### A. CASE IDENTIFICATION DATA

| 1. RETAILER INVESTIGATIONS BRANCH CASE IDENTIFICATION NUMBER | 3. STORE NAME AND ADDRESS |
|---|---|
| **TR25611** | **ASAFO Market** |
| 2. DATE       2/7/2007 | **1309 5th St NE** |
|  | **Washington**            **DC**    **20002** |

## B. INVESTIGATOR'S STATEMENT

1. I, _____ _____, Investigator, Food and Nutrition Service, United States Department of Agriculture, make the following statement freely and voluntarily, knowing that this statement may be used in evidence.

2. On the above date, at about (time) __10:15 AM__, I entered subject store. I selected the items specified in Section C below. This store has ___1___ primary grocery check-out registers. ___1___ (was/were) in operation at the time of purchase. At the check-out counter there (was/were) ___0___ person(s) in line ahead of me and ___0___ person(s) in line behind me. The clerk sold to me the items listed in Section C 2 and 3, below at a total cost of __$60.01__. As the clerk rang up the transaction, the EBT card was where it could have been viewed by the clerk. I gave the clerk the EBT card and food stamp program benefits were deducted from it by the clerk as described in Section E below. I departed the store at about __10:20 AM__

**OTHER COMMENTS**

Positive (1-Buy).

FORM FNS-413 (PAGE 1 OF 3) - (7-96) PREVIOUS EDITIONS OBSOLETE.

## USDA - FNS

## REPORT OF POSITIVE INVESTIGATION

| STORE NAME AND ADDRESS | RETAILER INVESTIGATIONS BRANCH CASE IDENTIFICATION NUMBER | DATE |
|---|---|---|
| ASAFO Market | TR25611 | |
| 1309 5th St NE | | 4/30/2007 |
| Washington        DC    20002 | AREA OFFICE | |
| | Trenton | |

____1____ Investigator(s) made ____8____ visits to the subject store during the period ____2/7/2007____ through ____4/27/2007____ . On ____8____ visits, violations of the Food Stamp Program regulations occurred. Details of each transaction are attached as Exhibits(s) __A__ through __H__ . A post-investigation interview with store personnel to obtain identification, if conducted, is documented in Exhibit __N/A__ .

☑ Store appears eligible for FSP participation   ☐ Store appears NOT eligible for FSP participation

REMARKS

Four 3-Buys occurred:  Exhibits B-E.

One Major was purchased:  Exhibit F.

Trafficking occurred twice: Exhibit G ($10 for $10) and
                            Exhibit H ($20 for $20).

AMR:  $13,600.00

FORM FNS-415 - (7-95) PREVIOUS EDITIONS OBSOLETE.

**SBU**
Sensitive But Unclassified

| US DEPARTMENT OF AGRICULTURE - FOOD AND NUTRITION SERVICE | EXHIBIT | H |
|---|---|---|
| **TRANSACTION REPORT** | PAGE | 1 |

| A. CASE IDENTIFICATION DATA | 3. STORE NAME AND ADDRESS |
|---|---|
| 1. RETAILER INVESTIGATIONS BRANCH CASE IDENTIFICATION NUMBER | ASAFO Market |
| **TR25611** | 1309 5th St NE |
| 2. DATE          4/27/2007 | Washington                    DC        20002 |

## B. INVESTIGATOR'S STATEMENT

1. I, ⸺⸺⸺ ⸺⸺⸺⸺, Investigator, Food and Nutrition Service, United States Department of Agriculture, make the following statement freely and voluntarily, knowing that this statement may be used in evidence.

2. On the above date, at about (time) __2:23 PM__ , I entered subject store. I selected the items specified in Section C below. This store has ___1___ primary grocery check-out registers. ___1___ (was/were) in operation at the time of purchase. At the check-out counter there (was/were) ___0___ person(s) in line ahead of me and ___0___ person(s) in line behind me. The clerk sold to me the items listed in Section C 2 and 3, below at a total cost of __$25.96__. As the clerk rang up the transaction, the EBT card was where it could have been viewed by the clerk. I gave the clerk the EBT card and food stamp program benefits were deducted from it by the clerk as described in Section E below. I departed the store at about __2:27 PM__ .

**OTHER COMMENTS**

Trafficking ($20 for $20).

## D. APPEARANCE OF CLERK

| 1. SEX | 2. AGE | 3. HEIGHT RANGE | 4. WEIGHT | 5. HAIR COLOR | CASE NUMBER | EXHIBIT |
|--------|--------|-----------------|-----------|---------------|-------------|---------|
| | | | | | TR25811 | B |
| | | | | | Result P | |

| 6. OTHER IDENTIFYING INFORMATION: | 7. IDENTIFIED DURING TRANSACTION AS : (Name) |
|---|---|

Same as Exhibit A, wearing a cap so she looked a little different.

**7. IDENTIFIED DURING TRANSACTION AS : (Name)**
None
(Title, Relationship to owner):
Unknown

**8. MEANS OF IDENTIFICATION:**
N/A

**PAGE** 3

**9. DETAILS OF TRANSACTION AT THE CASH REGISTER**

The clerk totaled the price, bagged the items, and debited the food stamp account.

## E. RECORD OF COUPONS ISSUED AND USED IN TRANSACTION

### 1. EBT Benefits Issued, Used, and Returned

| EBT Card Number | A. Issued Value | B. Used Value | C. Returned Value |
|---|---|---|---|
| | $94.17 | $39.82 | $54.35 |
| | $0.00 | $0.00 | $0.00 |

EBT Receipt Included?   Yes          Cash Register Tape Included?   No

### 2. Comments

None

## F. CERTIFICATION

EBT CASH:          $0.00

This declaration consists of     3     pages. I have signed or initialed each page. The facts stated in this declaration are true to my knowledge. If I am called to testify as a witness in any proceeding, I am competent to testify to the matters stated herein.

Further declarant sayeth not.

I declare under penalty of perjury the foregoing is true and correct

**I. DATE EXECUTED (Month, Day, Year)**
4/30/2007

FORM FNS-413 (PAGE 3 OF 3) - (7-98) PREVIOUS EDITIONS OBSOLETE

| C. SUMMARY OF PURCHASE | | CASE NUMBER | EXHIBIT |
|---|---|---|---|
| 1. PURCHASE PRICE CHARGED BY CLERK $50.01 | | TR25611 | A |
| **2. INELIGIBLE ITEMS** | | | PAGE |
| | | | 2 |
| QUANTITY AND DESCRIPTION | | | PRICE * |
| 1- | 3 pack IRISH SPRING bar soap | | 1.99 |

**3. ELIGIBLE ITEMS**

| QUANTITY AND DESCRIPTION | | PRICE * |
|---|---|---|
| 1- | 18 pack easy mac | NPI |
| 1- | 70 pack granola bar | NPI |
| 1- | 1 gal apple juice | NPI |

**4. ITEMS PURCHASED WITH CASH CHANGE**

| QUANTITY AND DESCRIPTION | PRICE * |
|---|---|
| None | |

**5. ITEMS REFUSED**

| QUANTITY AND DESCRIPTION | |
|---|---|
| None | |

*NPI=No Price Indicated or Price Illegible

FORM FNS-413 (PAGE 2 OF 3) - (7-98) PREVIOUS EDITIONS OBSOLETE.

| C. SUMMARY OF PURCHASE | | CASE NUMBER | EXHIBIT |
|---|---|---|---|
| 1. PURCHASE PRICE CHARGED BY CLERK $39.82 | | TR25611 | B |
| **2. INELIGIBLE ITEMS** | | | PAGE 2 |

| QUANTITY AND DESCRIPTION | PRICE * |
|---|---|
| 1- 12.6floz DAWN soap | NPI |
| 1- 11oz COLGATE shave cream | 1.69 |
| 1- 7.5floz SOFTSOAP hand soap | 1.29 |

**3. ELIGIBLE ITEMS**

| QUANTITY AND DESCRIPTION | PRICE * |
|---|---|
| 1- 1 gal juice | NPI |
| 1- 40oz peanut butter | NPI |
| 1- 40 pack rice Crispies | NPI |
| 1- 5 lb. rice | NPI |

**4. ITEMS PURCHASED WITH CASH CHANGE**

| QUANTITY AND DESCRIPTION | PRICE * |
|---|---|
| None | |

**5. ITEMS REFUSED**

| QUANTITY AND DESCRIPTION | |
|---|---|
| None | |

*NPI=No Price Indicated or Price Illegible

FORM FNS-413 (PAGE 2 OF 3) - (7-96) PREVIOUS EDITIONS OBSOLETE.

| US DEPARTMENT OF AGRICULTURE - FOOD AND NUTRITION SERVICE | EXHIBIT | B |
| --- | --- | --- |
| **TRANSACTION REPORT** | PAGE | 1 |

| A. CASE IDENTIFICATION DATA | 3. STORE NAME AND ADDRESS |
| --- | --- |
| 1. RETAILER INVESTIGATIONS BRANCH CASE IDENTIFICATION NUMBER **TR25611** | **ASAFO Market** **1309 5th St NE** |
| 2. DATE      2/13/2007 | **Washington**      **DC**   **20002** |

## B. INVESTIGATOR'S STATEMENT

1. I, _____ _____, Investigator, Food and Nutrition Service, United States Department of Agriculture, make the following statement freely and voluntarily, knowing that this statement may be used in evidence.

2. On the above date, at about (time) __4:20 PM__, I entered subject store. I selected the items specified in Section C below. This store has __1__ primary grocery check-out registers. __1__ (was/were) in operation at the time of purchase. At the check-out counter there (was/were) __1__ person(s) in line ahead of me and __0__ person(s) in line behind me. The clerk sold to me the items listed in Section C 2 and 3, below at a total cost of __$39.82__. As the clerk rang up the transaction, the EBT card was where it could have been viewed by the clerk. I gave the clerk the EBT card and food stamp program benefits were deducted from it by the clerk as described in Section E below. I departed the store at about __4:24 PM__.

**OTHER COMMENTS**

Positive (3-Buy).

**D. APPEARANCE OF CLERK**

| 1. SEX | 2. AGE | 3. HEIGHT RANGE | 4. WEIGHT | 5. HAIR COLOR | CASE NUMBER | EXHIBIT |
|--------|--------|-----------------|-----------|---------------|-------------|---------|
| F | 59-64 | 5'02" to 5'05" | 115-125 | Black | TR25811 | A |
| | | | | | Result P | PAGE 3 |

**6. OTHER IDENTIFYING INFORMATION:**

Wearing glasses.

**7. IDENTIFIED DURING TRANSACTION AS : (Name)**
None
(Title, Relationship to owner):
Unknown
**8. MEANS OF IDENTIFICATION:**
N/A

**9. DETAILS OF TRANSACTION AT THE CASH REGISTER**

The clerk totaled the price, bagged the items, and debited the
food stamp account.

**E. RECORD OF COUPONS ISSUED AND USED IN TRANSACTION**

**1. EBT Benefits Issued, Used, and Returned**

| EBT Card Number | A. Issued Value | B. Used Value | C. Returned Value |
|-----------------|-----------------|---------------|-------------------|
| | $174.63 | $60.01 | $114.62 |
| | $0.00 | $0.00 | $0.00 |

EBT Receipt Included?  Yes          Cash Register Tape Included?  No

**2. Comments**

-This could be the owner but a positive I.D. could not be made.

**F. CERTIFICATION** | EBT CASH: | $0.00

This declaration consists of  3  pages. I have signed or initialed each
page. The facts stated in this declaration are true to my knowledge. If I am called to
testify as a witness in my proceeding, I am competent to testify to the matters stated
herein.

Further declarant sayeth not.

I declare under penalty of perjury the foregoing is true and correct

**1. DATE EXECUTED (Month, Day, Year)**
4/30/2007

FORM FNS-413 (PAGE 3 OF 3) - (7-95) PREVIOUS EDITIONS OBSOLETE.

| D. APPEARANCE OF CLERK | | | | CASE NUMBER | EXHIBIT |
|---|---|---|---|---|---|
| 1. SEX | 2. AGE | 3. HEIGHT RANGE | 4. WEIGHT | 5. HAIR COLOR | TR25611 | H |
| | | | | | Result D | PAGE 3 |

| 6. OTHER IDENTIFYING INFORMATION: | 7. IDENTIFIED DURING TRANSACTION AS : (Name) |
|---|---|
| Same as Exhibit A. | None |
| | (Title, Relationship to owner): |
| | Unknown |
| | 8. MEANS OF IDENTIFICATION: |
| | N/A |

**9. DETAILS OF TRANSACTION AT THE CASH REGISTER**

The clerk totaled the price and as I gave her the card I asked if
she could change some stamps. She asked how much and I said
twenty. She said ok, I will add twenty to the total of $21.97
and I said ok. She debited the food stamp account and bagged the
items. The clerk said I didn't charge you for the juice so she
debited the food stamp account again for that. She gave me a
twenty dollar bill from the register, I thanked her and left.

**E. RECORD OF COUPONS ISSUED AND USED IN TRANSACTION**

**1. EBT Benefits Issued, Used, and Returned**

| EBT Card Number | A. Issued Value | B. Used Value | C. Returned Value |
|---|---|---|---|
| | $234.98 | $41.97 | $193.01 |
| | $193.01 | $3.99 | $186.02 |

EBT Receipt Included?  Yes          Cash Register Tape Included?  No

**2. Comments**

-(1) $20.00: EL52340292E Federal Reserve System  Series 2004

| F. CERTIFICATION | EBT CASH: | $20.00 | |
|---|---|---|---|
| This declaration consists of ___5___ pages. I have signed or initialed each page. The facts stated in this declaration are true to my knowledge. If I am called to testify as a witness in any proceeding, I am competent to testify to the matters stated herein. | | 1. DATE EXECUTED (Month, Day, Year) 4/30/2007 | |
| Further declarant sayeth not. | | 4. INVESTIGATOR'S SIGNATURE | |
| I declare under penalty of perjury the foregoing is true and correct | | | |

FORM FNS-413 (PAGE 3 OF 3) - (7-98) PREVIOUS EDITIONS OB2

# The Food Stamp Program

## Training Guide
## for Retailers





ALLSTATE LEGAL®    EXHIBIT    3



Note to Retailer: Your contact with the Food Stamp Program will be through your local field office of the USDA Food and Nutrition Service. If you do not know the address and phone number of this field office, you can find it by searching the following web site:

**http://www.fns.usda.gov/cga/Contacts/FieldOffices/**

# Contents

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Criteria for Retailers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Program Permit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Part 1: Basic Guidelines** . . . . . . . . . . . . . . . . . . . . . . . . . 8
Learn and Enforce the Program Rules . . . . . . . . . . . . . . . . . 8
Display the "We Accept Food Stamp Benefits" Poster . . . . . . 8
Report Violations to Your Local FNS Field Office . . . . . . . . . . 9
Cooperate With Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Respect Your Food Stamp Program Customers . . . . . . . . . . 10

**Part 2: What Can Food Stamp Benefits Buy?** . . . . . . . . . . 11
Proper Use of Food Stamp Benefits . . . . . . . . . . . . . . . . . . . 12
    Separate Eligible Foods . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Sales Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Credit Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Bottle Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    Making the Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    No Trafficking Is Allowed . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Store Coupons and Trading Stamps . . . . . . . . . . . . . . . . . 13

**Part 3: Electronic Benefits Transfer (EBT) Cards** . . . . . . . 14
    EBT Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    EBT Cards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Point-of-Sale (POS) Equipment . . . . . . . . . . . . . . . . . . . . . 15
    Food Stamp EBT Purchases . . . . . . . . . . . . . . . . . . . . . . . 15
Other Types of Food Stamp Program EBT Transactions . . . . 16
    Manual (Key Entry) Transactions . . . . . . . . . . . . . . . . . . . 16
    Refunds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Voiding a Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Paper EBT Vouchers . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Payment for EBT Transactions . . . . . . . . . . . . . . . . . . . . . . . 17
    System End-of-Day . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Payment to Your Bank Account . . . . . . . . . . . . . . . . . . . . . 17

Important . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Watch the POS Response . . . . . . . . . . . . . . . . . . . . . . . . . 18

Other Payment for "Denied" Transactions . . . . . . . . . . . . 18

Never Keep the PIN or the Card . . . . . . . . . . . . . . . . . . . . 18

Customer ID . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Balances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

No Cash Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Customer Signatures . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Questions About EBT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20


**Part 4: What Happens if You Break the Rules?** . . . . . . . . 22

**Penalties** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


**Appendix: Food Stamp Information for Customers** . . . . . 25

# Introduction

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·



America's health depends on good nutrition. However, many low-income households still need help to have a healthy diet. Each month millions of low-income Americans—more than half of them children—get that help through the Federal Food Stamp Program. Under the Program, State and local social services agencies give monthly food stamp benefits to households that qualify. These food stamp benefits—in the form of Electronic Benefits Transfer (EBT) debit cards—can be used to buy food at authorized retail food stores.

Every retailer who participates in the Food Stamp Program must follow all Program laws and regulations. This guide will help you learn the Program rules and answer common questions about the Food Stamp Program. Even an honest mistake could cost you your authorization, so please make sure you pay special attention to *Part 4: What Happens if You Break the Rules?*

The Food Stamp Program is administered by the Food and Nutrition Service (FNS) of the U.S. Department of Agriculture, through its nationwide network of FNS field offices. FNS field offices authorize qualified retailers to accept food stamp benefits, provide information to retailers, and enforce the Program rules to prevent errors and abuse.

The staff of your local FNS field office is available to answer your questions and advise you on Program rules and procedures. Always consult with them if you have a problem or are unsure how to handle a particular situation.

At the end of this publication, we have also included information that will be helpful to anyone wanting to know more about the Program and how to apply for food stamp benefits. This may be helpful in case any of your customers ask, or if you wish to tell somebody about the Program.

**Criteria for
Retailers**

Local FNS field offices determine whether retail food stores
meet the eligibility criteria to be authorized to accept
food stamp benefits. The Food Stamp Program laws and
regulations require that retail food stores must meet one of
these two criteria:

1. Your store must offer for sale, on a continuous basis, at
   least  three varieties of qualifying foods in each of the four
   categories of staple foods:

   - breads/cereals
   - dairy products
   - fruit and vegetables
   - meat, fish, poultry

At least two of these categories must include perishable foods.

2. Your store must have over 50 percent of its total gross sales
   in staple foods, not counting food items such as coffee,
   tea, cocoa, carbonated and noncarbonated drinks, candy,
   condiments, spices, and prepared, ready-to-eat foods.

   Remember that you may be visited at any time to ensure
   that these criteria continue to be met. In addition, your store
   will be  reauthorized at least once every 5 years.



**Program
Permit**

You must be authorized to participate. When you are authorized you will receive a 7-digit FNS number. This number will be one of the ways the local FNS field office will use to identify you and your store.

You will also receive a Food Stamp Program Permit (see below). You cannot begin to accept food stamp benefits until you have it. You cannot use the permit that belonged to any previous owner of your store. If your store changes ownership, if you move, or if you close your store, your authorization permit is void. You cannot transfer it to someone else. You must return your permit to your local FNS field office. If you own more than one store, you must apply for a Food Stamp Program Permit for each store.

**Food Stamp Program Permit**



USDA

**U.S. Department of Agriculture - Food and Nutrition Service**

**FOOD STAMP PROGRAM PERMIT**

**FNS NUMBER:**

Store Name:
Mailing Address:

Store Type:
Location Address:

Authorization Date:
Owner Name(s):

Field Office:
Field Office Address:

This permit certifies the owner(s) and business location listed above are hereby granted approval to accept and redeem food stamp benefits on condition that the acceptance and redemption of all coupons/instruments shall be in accordance with the rules and regulations governing the Food Stamp Program.

**THIS PERMIT IS NOT TRANSFERABLE**

Any changes in the ownership, location, name of business, and/or operation void this permit. To prevent illegal use, this permit must be returned to the Food and Nutrition Service (FNS) upon any change/sale/transfer of the business or upon request by the FNS. Failure to report changes immediately to FNS may result in substantial fines and administrative sanctions. IF STORE MOVES, IS SOLD/CLOSED OR VOLUNTARILY WITHDRAWS FROM THE FOOD STAMP PROGRAM, PLEASE CONTACT YOUR SERVICING FIELD OFFICE.

Issued by FNS Representative: _____    Date of Issue: _____

**THIS PERMIT MUST BE DISPLAYED IN A CONSPICUOUS PLACE**

# Part 1:          Basic Guidelines

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

**Learn and Enforce
the Program Rules.**

Accepting food stamp benefits can help build your business.
If you violate the rules, however, you could lose your
authorization, be fined, or both.

Protect your business. Learn the proper way to handle food
stamp transactions. You are responsible for the actions of your
employees. Train them before they begin ringing sales. Monitor
their performance. Conduct refresher courses when necessary.
When changes in the Program are announced, make sure
everyone knows about them. It is a good idea to document the
training you provide for your employees.

**Display the "We Accept
Food Stamp Benefits"
Poster.**

Your local FNS field office will give you a "We Accept Food
Stamp Benefits" poster, FNS-132 (see below). Post it in
a prominent place, to let your customers know that you
participate in the Program.

**"We Accept Food Stamp Benefits" Poster, FNS-132**



**Report Violations to Your
Local FNS Field Office.**

Help us keep the Food Stamp Program honest. If you are
unsure of a procedure, or you suspect someone is violating
the Program's laws and regulations, contact your local FNS
field office. **You can also call the USDA Office of Inspector
General Hotline at 1-800-424-9121.**

To encourage people to report fraud and abuse, retail stores
must post a sign giving information on how to report Program
abuse. When you become an authorized retailer, this poster
is provided to you in your authorization package. Display
your "Report Abuse of the Food Stamp Program" poster
prominently.

### USDA Office of Inspector General Hotline
# 1-800-424-9121

**"Report Abuse of the Food Stamp Program" Poster, FNS-240**



**Cooperate
With Authorities.**

From time to time USDA employees or their representatives may visit your store or request information from you. You may also be visited by contractors who work for USDA and they may take pictures of your store, both inside and out. You are required to cooperate and to respond to all requests. If you do not, you may lose your Food Stamp Program authorization.

**Respect Your Food Stamp
Program Customers.**

Finally—and most importantly—treat your food stamp customers as you do your other customers: with courtesy and respect.

**DO NOT:**

- restrict food stamp customers to shopping at certain times during store hours, charge them higher prices, or make them use lanes designated "Food Stamp ONLY Checkout."

- require customers to make minimum purchases.

- ask customers for their Personal Identification Number (PIN). Only the customer may enter his or her PIN at the Point of Sale (POS) terminal to complete the food stamp sale.

Each of these practices violates the law or regulations.

# Part 2:

# What Can Food Stamp Benefits Buy?

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

The goal of the Food Stamp Program is to help low-income households have healthy diets.

**Households CAN use food stamp benefits to buy:**

- all food intended to be eaten at home. This includes the four staple food categories mentioned earlier as well as nonalcoholic beverages, snack foods, soft drinks, candy, and ice.

- seeds and plants intended to grow food (but not for growing flowers or feeding to birds).

**Households CANNOT use food stamp benefits to buy:**

- beer, wine, liquor, tobacco, or cigarettes

- foods that are hot at the point of sale

- food to be eaten in the store

- vitamins or medicines

- pet foods

- nonfood items such as tissues, soaps, cosmetics, or other household goods.

If you have questions about specific food items, contact your local FNS field office. You can find the field office by going to:

**http://www.fns.usda.gov/cga/Contacts/FieldOffices/**

A poster describing what can and cannot be bought with food stamp benefits will be provided to you (see illustration at left).

**"Using Food Stamp Benefits" Poster, FNS-110**



## Proper Use of Food Stamp Benefits

Customers should present food stamp benefits BEFORE they pay for food.

● **Separate Eligible Foods**
If your customers separate their eligible and ineligible items—or if you do it—it will make it easier to total the food items that qualify for food stamp benefits. If your store has electronic registers or scanners that automatically identify eligible items, separating items is not necessary. Equipment should be periodically checked for proper programming, to avoid errors that might cost you your authorization.

● **Sales Tax**
You cannot charge State or local sales taxes on eligible items purchased with food stamp benefits. You may not include the sales tax in the purchase price as a hidden cost. (Keeping eligible and ineligible items separate will also prevent you from accidentally charging sales tax on eligible items.) If you have questions about your State's sales tax laws, you should contact your State tax department.



● **Credit Accounts**
Food stamp customers must pay for their purchases at the time of sale. **You may not accept food stamp benefits as payments on credit accounts.** You may not hold your customers' food stamp EBT cards at your store for future use.

● **Bottle Deposits**
Food stamp benefits can cover the entire cost of items such as eligible drinks in returnable bottles, where the price includes a specific bottle deposit. This is true even if the deposit is not included in the shelf price.

● **Making the Sale**
If a customer does not have enough food stamp benefits to pay for all his or her eligible items, give the customers the option of paying for the remaining items with cash or not buying them. The client can pay the difference with a second card swipe to debit the cash benefits account (if the client has one) on his or her EBT card, or with cash. Remember: you cannot extend credit to be paid with food stamp benefits at a later date.



● **No Trafficking Is Allowed**
  **You can never give cash in exchange for food stamp benefits. This practice is known as "trafficking."**

● **Store Coupons and Trading Stamps**
  If you accept in-store coupons from cash customers, you must also accept them from food stamp customers. You must treat food stamp customers as you do cash customers.

# Part 3:    Electronic Benefits Transfer (EBT) Cards

Today, the only form of benefit issuance is the EBT card. One of the biggest advantages of the electronic system is that it automatically deducts the exact amount of the purchase from the customer's EBT account and deposits it in your store's bank account.

● **EBT Systems**

EBT systems operate like other debit card systems. An electronic message goes to a computer for approval. If the purchase is approved, the customer's EBT account gets an immediate debit and your account gets an immediate credit. At the end of the business day, transactions are totaled and the funds are moved. You will usually receive money from an EBT transaction within 2 banking days.



The State's EBT contractor will contact you soon after you are authorized to accept food stamp benefits. They will help you determine if you need EBT equipment. If the contractor supplies you with EBT equipment, they will also provide training on how to use it. You will receive a manual with information on how to use the system.

All but two States have "on-line" EBT systems which send transactions to a remote computer for approval. Ohio (OH) and Wyoming (WY) are different. They have "off-line" EBT systems and use "smartcards" with a microprocessor chip embedded, but visible, in the plastic card. "Off-line" means the transaction approval is done by the microprocessor in the card. The transaction does not travel "on-line" to a remote computer. OH and WY cards work only at POS terminals provided to stores in those States. Although OH and WY cards work only in OH or WY, all other State cards work in all States as well as in stores in OH and WY that have their own POS terminal.

Note: OH will change to an on-line system and will have magnetic strip cards in 2006. Those will be usable in all States. As of this printing, WY has not made a decision to change.



### ● EBT Cards

Each State has its own EBT card design. The EBT cards are plastic and look like commercial debit and credit cards. Almost all cards have embossed numbers on the front and a magnetic strip and a signature line on the back. Often, the toll-free numbers for Customer Service are on the back of the card. The law requires EBT systems to have food stamp EBT cards that can work in any State, except for the smartcards issued by Ohio and Wyoming.

### ● Point-of-Sale (POS) Equipment

All authorized retailers can process EBT food stamp benefit transactions. States may supply POS equipment or vouchers, or you may choose to use commercial equipment provided to you by a third party processor (which needs to be arranged by you). Commercial equipment can also be used to process credit and debit card transactions. The State will contact you and connect your commercial equipment to its EBT system. This service is provided at a cost that you negotiate with the third party processor. Commercial equipment is often integrated, meaning that the POS terminal, cash register, and scanning device are all connected together in order to speed transactions and eliminate errors.

### ● Food Stamp EBT Purchases

Although EBT equipment set-up varies from State to State, the cashier should follow these general steps for a food stamp EBT purchase:

- Separate eligible foods from nonfood items. Total the food amount on the cash register. This step may not be necessary depending on the type of equipment you have in your store.

- Press "Food Stamp Purchase" key and swipe the EBT card through the POS card reader.

- Enter purchase amount into the POS terminal (if separate equipment from cash register).

- Customer enters secret Personal Identification Number (PIN) and hits the enter key. **Only the customer may do this.**

- "Approved" message will appear on POS terminal and a receipt is printed.

- Give the customer a receipt that shows the EBT balance.

## Other Types of Food Stamp Program EBT Transactions

### ● Manual (Key Entry) Transactions

When EBT cards are swiped through your POS device, the device reads the card number and other information from the strip on the back of the card. Sometimes the magnetic strip on the card is damaged and swiping the card will not work. **IF** and **ONLY IF** the card strip cannot be read by the POS machine, and the customer is present, then you may use the keys to type in the card number. **You cannot keep the card numbers on file, or enter them manually unless the EBT cardholder is present.** The card holder must still enter his or her PIN to authorize a key-entered transaction. Food Stamp Program regulations permit key entry as a back-up convenience for recipients, but the recipient is expected to get a replacement for his or her damaged card. Damaged cards are replaced free. Please do not use the manual key-entry method unless the POS device or the client's card is not working.

FNS monitors the frequency of key entry by store. If a key-entry transaction fails, the recipient needs to pay by another method (e.g., cash)—do not use a **paper EBT voucher** (see page 17) in this situation.

Cards are hard to damage. If your POS terminal frequently does not accept EBT cards, it may need servicing. Advise customers to replace their cards if the magnetic strip is damaged.



### Refunds

● You can make refunds into the EBT account if the customer returns food bought with food stamp benefits. **Do not refund cash.** Learn to use the Food Stamp Program Refund Transaction. This may require a supervisor's or manager's approval as part of the transaction. Your EBT retailer manual will have details.

### Voiding a Transaction

● If you enter the wrong amount into the POS terminal and it is approved, some systems allow you to immediately void that transaction. This may have to be done at that same POS terminal and may require a manager's password. You may then redo the transaction correctly.

● **Paper EBT Vouchers**
**Paper vouchers are used only when the EBT transaction cannot be done electronically.** This may happen if your POS terminal fails, telecommunications fail, or the host computer is down. **You must complete the voucher, have your customer sign it, and call Customer Service at the time of the purchase to get an approval for the purchase.** This guarantees that the funds will be held for the purchase.

Always keep your copy of the voucher in case of disputes. You must electronically clear the voucher within 15 days or send the voucher to the State by a set expiration date in order to be paid for the transaction.

**Some stores do not qualify for equipment.** For these stores, the paper voucher is the only way to take EBT cards. See your EBT retailer manual for details.

## Payment for EBT Transactions

● **System End-of-Day**
EBT systems have an end-of-day or cutover time when all the transactions for the day are totaled and the transfer of funds for settlement of accounts begins. Find out when your State's EBT system's day ends.

If you have a State POS system, you can use it to produce totals for your store. This will help you keep your accounts in order. You will get an EBT retailer manual that explains this.

If you have commercial equipment, your system may have a different cutover time from the EBT system. Ask your processor for more information.

● **Payment to Your Bank Account**
If you have State equipment, the State contractor will need your bank account information to make payments to your account. If you change your bank or your account, you must tell the contractor so that the payment will go to your new account. Payment will usually arrive in your account within 2 banking days. If you have commercial POS equipment, payment will go from the State EBT contractor to your processor within 2 days. Your processor will then pay your account according to your agreement.

According to Food Stamp Program policy, banks cannot charge retailers to deposit Food Stamp Program EBT payments.

**Important**

● **Watch the POS Response**
Always watch the messages on the POS display. They indicate the transaction type and the results. Your store will be paid only when purchases are approved. Be sure you press the purchase key and not the refund key. Be sure the purchase is approved. Be sure your POS is not in training mode.

● **Other Payment for "Denied" Transactions**
If the purchase is denied because there are insufficient funds in the Food Stamp Program account, the customer may pay in cash. Some customers may have an EBT cash account in addition to a food stamp account. If so, you may run another transaction and use the cash account to pay the balance of the transaction. Otherwise, the customer will need to pay with actual cash.

● **Never Keep the PIN or the Card**
Never ask your customer for the PIN and do not watch the PIN being entered. Do not enter the PIN for the customer. Store cashiers may have to swipe EBT cards for the customer, depending on where the POS is located. Give the card back immediately. Never keep the card or the card number.



### ● Customer ID

When using POS equipment, the PIN identifies the customer. No other identification is needed. Most States no longer issue food stamp ID cards to EBT customers.

### ● Balances

Customers can check the balance in their EBT food stamp account in four ways. POS terminals can be programmed to have a balance inquiry function that will provide the balance. Many POS terminals have this function. The customer can also call a toll-free number to get the balance over the phone. After each EBT purchase transaction, the POS receipt shows the remaining food stamp account balance. Finally, in some States, recipients can check their balance through the Internet.

You may not charge a customer to do a balance inquiry.

### ● No Cash Change

No cash change is given back in EBT transactions because the exact amount of the purchase is entered and debited. When EBT cards are used, it is illegal for you to give cash change back. EBT systems allow for returns and refunds to be processed using the card.

### ● Customer Signatures

**You do not need the customer's signature when the EBT transaction is done with a PIN.** You do not need a signature for purchase or refund transactions. If you are using a voucher to process the food stamp transaction, the customer must sign the voucher. This is needed in case of a dispute, so keep the voucher with the original signature for your records and provide a copy to the customer.

**Questions About EBT**

● **Q. Who does what in EBT?**

**A.** FNS authorizes the stores for the Food Stamp Program. FNS sets general EBT rules. **Each State manages its own EBT system and hires contractors to process EBT transactions, issues EBT cards, and furnishes POS equipment.**

● **Q. What is a third party processor?**

**A.** We use the name "third party processor" for any transaction processing provider hired by a store. This distinguishes third party processors from the State's EBT contractor hired to provide or arrange transaction processing for stores that do not have their own POS equipment.

● **Q. How does the customer know how much money is in his or her account?**

**A.** Food stamp customers are trained to keep their EBT receipts, which have the account balance. This is why you must always provide the receipt. **Customers may also call a toll-free number or do a balance inquiry on the POS terminal in the store.** In some States, if customers have access to the Internet they can check their balance.

● **Q. What happens if the customer lost the card?**

**A.** You may NOT do the transaction without the card. Refer the customer to the State's toll-free Customer Service Help Line her or she was given during EBT training, or to the county office—not the local FNS field office.

● **Q. What if the customer forgot the PIN?**

**A.** You may NOT do the transaction without the PIN. Refer the client to the toll-free Customer Service Help Line that her or she was given during EBT training to get a new PIN. The customer service number may be on the back of the card.

● **Q. What will EBT cost you?**

**A.** If you have State equipment, EBT costs nothing. If you use your own equipment, you will work out costs with your own transaction processing provider.

● **Q. What if a customer presents paper food stamp coupons rather than an EBT card?**

**A.** There are still some food stamp coupons in circulation. You must accept them. Contact your local FNS field office for redemption information.

● **Q. Is there a risk in accepting paper EBT vouchers when system problems occur?**

**A.** Only if you fail to make the call to Customer Service for an approval number or if you fail to follow the voucher instructions in the EBT retailer manual.

● **Q. What if I sell my store?**

**A.** The new owner is NOT authorized to accept food stamp benefits. You cannot transfer Food Stamp Program authorization. If you have State equipment, tell the State EBT contractor by calling the Retailer Customer Service number before you hand over the store.

**Read the retailer instructions you get with your State POS machine or materials provided by your own processor.**



# Part 4: What Happens if You Break the Rules?



The Federal Government spends about $25 billion a year to support the Food Stamp Program. This is a tremendous investment by American taxpayers. USDA protects that investment by vigorously enforcing the Program's laws and regulations and aggressively pursuing violators.

Thousands of retailers have discovered that the penalties for violations can be severe. As a store owner or operator, you are legally responsible not only for your own actions but for those of everyone who works in your store, whether or not they are paid. If you, your staff, your employees, or relatives redeem more food stamp benefits than your total food sales; sell ineligible items; accept food stamp benefits in payment for food sold to a food stamp household on credit; or buy or sell food stamp benefits, you will be disqualified from the Program, and/or assessed a monetary penalty, and could face criminal prosecution.

You can be fined up to $10,000 for each illegal transaction, plus three times the dollar value of the transaction, and you can be put in prison.

In addition, violators may be referred to the Internal Revenue Service for more extensive investigation, and may lose their State lottery licenses and alcohol beverage sales licenses.

The most common penalty is being disqualified from the Food Stamp Program.

If you are disqualified from the Food Stamp Program, you could also be disqualified from the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC). Even a temporary disqualification can blemish your business' reputation and its standing in the community.

Know and follow the laws and regulations, train your employees carefully, and monitor their performance. If a situation arises that you are not sure how to handle, always call the local FNS field office first.

**Penalties**

**The following Federal penalties apply to retailers.**

**Trafficking**—Buying or selling food stamp benefits for cash or other items besides eligible food will result in permanent disqualification, forfeiture of property, and/or a penalty of up to $27,000 for each violation and will not exceed $54,000 for all violations occurring during a single investigation.

**Sale of Firearms, Ammunition, Explosives, or Controlled Substances**—Sale of firearms, ammunition, explosives, or controlled substances for food stamp benefits will result in permanent disqualification or a penalty of up to $27,000 for each violation and will not exceed $54,000 for all violations occurring during a single investigation.

**Sale of Cigarettes, Tobacco, and Alcohol**—Sale of cigarettes, tobacco, alcohol, or expensive nonfood items for food stamp benefits may result in a 3- to 5-year disqualification period or equivalent civil money penalty. A claim may also be assessed.

**"Penalties for Violation of the Food Stamp Program," FNS-136**



**Penalties Include:**

☐ **Permanent disqualification** when the owner or employees purchase or traffic in food stamp benefits, or for a third sanction.

☐ **Three to five year disqualification** for the sale of non-food items, such as alcoholic beverages or tobacco.

☐ **One year disqualification** for accepting food stamp benefits for payment of credit accounts.

☐ **Six month to three year disqualification** for the sale of non-food items, such as, but not limited to: soap, paper products, medicines, etc.

**Sale of Ineligible Items**—Sale of common ineligible nonfood items on a regular basis for food stamp benefits may result in a 6-month to 3-year disqualification or equivalent civil money penalty. A claim may also be assessed.

**Food Stamp Benefit Redemptions Exceeding Food Sales**—A store whose food stamp benefit redemptions for a specified period of time exceed its food sales for the same period of time may be disqualified for 3 to 5 years.

**Accepting Food Stamp Benefits Without Authorization**—Accepting food stamp benefits without authorization or after the effective date of disqualification will result in a fine of $1,000 for each violation, plus an amount equal to three times the value of the illegally accepted food stamp benefits.

**Second and Third Violations**—The period of disqualification will be doubled for a second violation. For a third violation, the action is permanent disqualification.

**WIC/Food Stamp Reciprocal Actions**—Stores that are disqualified from WIC may be disqualified from the Food Stamp Program for an equivalent period of time.

NOTE: In addition to the preceding Federal penalties, many States have their own laws pertaining to the improper use of food stamp benefits, and their own penalties.

# Appendix:    Food Stamp Information for Customers

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

As a retailer in the Food Stamp Program, you might like to know how the Program works from the customer's point of view. You might also wish to have some information in case a customer is interested in knowing more about the Program.

The following questions and answers are from a booklet called "Food Stamp Program," Publication No. FNS-313 (also available in Spanish, FNS-313-S). Your customer can ask for a copy by calling toll free 1-800-221-5689. He or she can also find out the toll-free number in your State, which can tell the customer the location and phone number of the nearest food stamp office.

There is also more information about the Program on the following Web site: **http://www.fns.usda.gov/fsp**



● **How do I get food stamp benefits?**
Look in the government section (blue pages) of your phone book. You can find food stamp benefits under "social services department" or "human services department."

Call the food stamp office to set up a meeting with a worker. Ask what papers you need to bring. The worker will need to see your pay stubs, rent or mortgage payments, utility bills, child- or elder-care bills, and child-support orders (the court order and canceled checks).

At the food stamp office you will talk with a worker, answer some questions, and sign some papers. If you can't go to the food stamp office, you may send a relative or a friend to talk with the worker. Or you may be able to talk with a worker on the phone.

One way to see if you might be able to get food stamp benefits is to go to **http://www.foodstamps-step1.usda.gov** on the Internet. Answer the questions. If it looks like you might be eligible, you can also find out how much you could receive. But to find out for sure, you must apply.

● **Can I get food stamps just for myself if I live with my family or with others?**
People who live together and buy food and prepare meals together are grouped as a "household." Husbands and wives and most children under age 22 must be one household.

● **Will I have to get a social security number?**
Yes, you must have or will have to get a social security number for each household member. People in the household who do not want food stamp benefits do not have to give their social security number. But they do have to give their financial information.

● **Can legal noncitizens get food stamp benefits?**
You might be able to get food stamp benefits. Talk with a food stamp worker about this. Even if you can't get food stamp benefits, family members born in this country can. Getting food stamp benefits won't cause you any problems if you want to become a citizen.

● **Can I get help if I'm not working?**
Yes, but if you are able to work, you must look for work, take a job offer, or go to training.

● **How much income and resources can we have?**
The food stamp office will tell you if your income and resources are low enough to get food stamp benefits. It depends on the number of persons in your household and also changes slightly every year. The food stamp office will also tell you if any of your expenses can be deducted from your income to help you qualify for food stamp benefits.

● **If my household is eligible, how much will we get?**
The food stamp office will tell you how much you will get. It will depend on your income and on the number of people in your household.

● **Are food stamp benefits cash?**
No. Food stamp benefits come on a plastic card that you use just like a bank card. You can use them in most food stores, but only for food.

● **What if I have more questions?**
You should call your local food stamp office. Our toll-free number, 1-800-221-5689, can direct you to your State's toll-free number.

For more information about this program and other Federal food assistance programs, please visit our Web site at **http://www.fns.usda.gov.**

Find your balance between food and physical activity.
A healthy eating plan is one that:
• Emphasizes fruits, vegetables, whole grains and fat-free or low-fat milk and milk products
• Includes lean meats, poultry, fish, beans, eggs and nuts
• Is low in saturated fats, trans fats, cholesterol, salt (sodium) and added sugars

Be physically active for at least 30 minutes most days of the week.





United States Department of Agriculture
Food and Nutrition Service





United States
Department of
Agriculture

Food and Nutrition
Service

Towson Field
Office

515 East Joppa Rd,
Suite 208,
Towson, MD
21286-5418

Phone:
410-962-2390
Fax:
410-962-2401

November 14, 2007

Philomena Affum
Asafo Market
1309 Fifth St Ne Stand Numbers 39 And 40
Washington, DC 20002

Consideration has been given to the information and evidence available to us relating to our letter of charges dated October 10, 2007, and to your reply of November 05, 2007. We find that the violations cited in our charge letter occurred at your firm.

We considered your eligibility for a trafficking civil money penalty (CMP) according to the terms of Section 278.6(i) of the Food Stamp Program (FSP) regulations (enclosed). We have determined that you are not eligible for the CMP because you failed to submit sufficient evidence to demonstrate that your firm had established and implemented an effective compliance policy and program to prevent violations of the Food Stamp Program.

Therefore, your firm shall be permanently disqualified from the Food Stamp Program, effective upon receipt of this letter. This is in accordance with Section 278.6(c) and 278.6(e)(1) of the FSP regulations.

This determination will be final unless you submit a written request for review to the Chief, Administrative Review Branch, USDA, FNS, 3101 Park Center Drive, Room 608, Alexandria, Virginia 22302. Your request for review must be postmarked by midnight of the 10th calendar day after you receive this letter, in order to be considered timely. If the 10th day of the period for requesting review falls on a Saturday, Sunday or legal (Federal) holiday, as specified in Section 279.2(c) of the FSP regulations, a request for review will be timely if it is postmarked the next day which is not a Saturday, Sunday or legal (Federal) holiday. The rules governing your review rights are contained in Section 278.6(n) and Part 279 of the FSP regulations.

During this review process, you may not accept food stamp benefits until a decision is rendered. If the permanent disqualification of your firm is later reversed through administrative or judicial review, USDA shall not be liable for the value of any sales lost during the period of disqualification you served (FSP regulations Section 278.6(c)).

This determination shall not preclude the Department of Agriculture or any other agency or department of the United States from taking further action to collect any claim determined under the FSP regulations or under any other pertinent statutes or

AN EQUAL OPPORTUNITY EMPLOYER



regulations, nor shall this determination preclude prosecution under any applicable laws.

Your Electronic Benefit Transfer (EBT) processor will be advised to disable your EBT connection. Your EBT machine should be returned to your EBT vendor. If you accept food stamp benefits after the effective date of disqualification, you will be subject to a monetary fine per Section 278.6(m) of the FSP regulations and possible prosecution under applicable laws.

If you are an authorized vendor under the Special Supplemental Nutrition Program for Women, Infants, and Children (WIC), you may be disqualified from the WIC Program as a result of your disqualification from the FSP. In accordance with current law governing both the FSP and the WIC Program, such a WIC Program disqualification is not subject to administrative or judicial review under the WIC Program. A CMP from the Food Stamp Program may also result in a WIC Program disqualification, but such a disqualification would be subject to administrative and/or judicial review.

In the event that you sell or transfer ownership of your store subsequent to your disqualification, you will be subject to and liable for a CMP as provided by FSP regulations Sections 278.6(f)(2), (3), and (4). The amount of this sale or transfer CMP will be calculated based on FSP regulations at 278.6(g).

Sincerely,

SARAH DUNCAN
Officer-In-Charge
Towson, MD Field Office

Enclosure

AN EQUAL OPPORTUNITY EMPLOYER

Philomena Affum
Asafo Market
1309 5ᵗʰ St. NE #39 & 40
Washington, D.C. 20002

The Chief
Administrative Review Branch
USDA, FNS
3101 Park Center Drive
Alexandria, VA 22302

Dear Sir/Madam,

Your letter dated on November 14, 2007 was received on Sunday, November 18, 2007 and the contents were well noted. However, I feel that the penalty of permanent disqualification from the Food Stamp Program is rather too harsh considering this is a first time offense. I am deeply sorry that this mistake occurred and the worker who has committed this offense has been reprimanded and is very sorry as well. I humbly ask that the matter be given another consideration and the penalty be lessened so that we may remain in business. Thank you for giving me this opportunity to request a review of this issue. I hope to hear from you soon.

Sincerely,

Philomena Affum
Owner
Asafo Market



United States
Department of
Agriculture

**USDA**

DEC 0 5 2007

Food and
Nutrition
Service

Administrative
Review Branch
Suite 606

3101 Park
Center Drive

Alexandria, VA
22302

(703) 305-2846

General:
(703) 305-2820

Fax:
(703) 305-2821

jerry.masefield
@fns.usda.gov

Philomena Affum, Owner
Asafo Market
1309 5th St. NE, Stands #39 & #40
Washington, DC 20002

Dear Ms. Affum:

The Chief of the Administrative Review Branch received your letter received November 26, 2007 in which you requested an administrative review of the initial decision by the Towson Field Office of the Food and Nutrition Service to permanently disqualify your store from participation in the Food Stamp Program. The Branch Chief has granted your request for review and has assigned the case to me. Any further correspondence regarding this review should be addressed to me.

If there is any additional information you may wish to provide in support of your position in this matter, it must be provided to me within three weeks of the date you receive this letter.

Sincerely,

JERRY A. MASEFIELD
Administrative Review Officer

EXHIBIT

6

Philomena Affum, Owner
Asafo Market
1309 5ᵗʰ St. NE, Stands #39 & #40
Washington, DC 20002
December 26, 2007


Jerry A. Masefield
Food and Nutrition Services
Administrative Review Branch Suite 808
3101 Park Center Drive
Alexandria, VA 22302


Dear Mr. Masefield,

    I would like to first say that I am very grateful for this opportunity to further discuss this food stamp situation. I would like to state once again that I am deeply sorry for my mistake in improperly using the Food Stamp Program. My helper who was responsible for this great error was informed from the very beginning that the EBT was strictly for use with food items only and nothing else. I believe she did not truly understand the importance of adhering to this rule and began to also allow for the sale of non-food items with EBT without my knowledge. Please understand that I was not aware of her actions and I do not condone what she has done. However, as owner of Asafo Market I must take responsibility for the actions of my helper.

    The loss of the Food Stamp Program at my store has damaged me tremendously financially. I depend primarily on revenue from the food stamps to keep my store going. The majority of those who shop at my store utilize food stamps and because of the loss of the EBT, my store has lost many customers to other businesses. As a result, it has become increasingly more difficult to sustain my store; with very large loans, rent, and very little business income from lack of EBT, I am in danger of losing everything. As a new business, which just started last year, my family has worked hard and has put everything into trying to make it a success. In trying to make the store a success I have tried to conduct business honorably and honestly. It seems that in this instance, a mistake was made. Asafo Market, had no intention in abusing or taking advantage of the privilege to the Food Stamp Program. I can wholeheartedly say that my helper who made this error and myself who is responsible, are deeply sorry and have paid dearly for what has occurred. We have learned from this experience and understand the seriousness of what has occurred.

    I humbly yet imploringly ask that you grant me and my store, Asafo Market, a second chance. As of now, all that I have worked for and sacrificed is a failure, but with another opportunity to right this wrong, it can be turned into a success. If you grant Asafo Market the privilege of using the Food Stamp Program ever again, I promise you that misuse of the EBT will never happen again. In addition, the helper who directly misused the EBT is no longer there, based on her own decision, which means she will not be present to make the same mistake



EXHIBIT
7

again if granted that privilege again.  I cannot express enough how sorry I am and how important the Food Stamp Program is to the store's survival.  Please give Asafo Market another chance at life.  Thank you.

Sincerely,

Philomena Affum



United States
Department of
Agriculture

Food and
Nutrition
Service

Administrative
Review Branch
Suite 606

3101 Park
Center Drive

Alexandria, VA
22302

(703) 305-2845

General:
(703) 305-2820

Fax:
(703) 305-2821

jerry.masefield
@fns.usda.gov

JAN 2 2 2008

Philomena Affum, Owner
Asafo Market
1309 5th St. NE, Stands #39 & #40
Washington, DC 20002

Re:   Asafo Market v. Towson, Maryland Field Office

Dear Ms. Affum:

Enclosed is the Final Agency Decision of the U.S. Department of Agriculture (USDA),
Food and Nutrition Service in response to your request for administrative review
received on November 26, 2007.  Also included therein is a statement regarding your
rights to a judicial review.

It is the decision of the USDA that there is sufficient evidence to support a finding that
a Permanent Disqualification from participating as an authorized retailer in the Food
Stamp Program was properly imposed against Asafo Market by the Towson, Maryland
Field Office.

Sincerely,

JERRY A. MASEFIELD
Administrative Review Officer

Enclosure

EXHIBIT
8
ALL-STATE LEGAL®

U.S. Department of Agriculture
Food and Nutrition Service
Administrative Review
Alexandria, VA 22302

Asafo Market,                          )
                                       )
    Appellant,                     )
                                       )
        v.                        )        Case Number: C0113519
                                       )
Towson, Maryland Field Office,         )
                                       )
    Respondent.                    )
                                       )

## FINAL AGENCY DECISION

It is the decision of the U.S. Department of Agriculture (USDA), Food and Nutrition Service (FNS), that there is sufficient evidence to support a finding that a Permanent Disqualification from participation as an authorized retailer in the Food Stamp Program was properly imposed against Asafo Market by the Towson, Maryland Field Office (hereinafter "Field Office").

## ISSUE

The issue accepted for review is whether the Field Office took appropriate action, consistent with 7 CFR §278.6(e)(1)(i) in its administration of the Food Stamp Program (FSP) when it imposed a Permanent Disqualification against Asafo Market on November 14, 2007.

## AUTHORITY

7 U.S.C. 2023 and its implementing regulations at 7 CFR §279.1 provide that "[A] food retailer or wholesale food concern aggrieved by administrative action under §278.1, §278.6 or §278.7 . . . may file a written request for review of the administrative action with FNS.

## STATEMENT OF THE CASE

The USDA conducted an investigation of the compliance of Asafo Market with Federal FSP law and regulations during the period February 7 through April 27, 2007. The investigation reported that personnel at Asafo Market, in addition to accepting FSP benefits in exchange for ineligible merchandise on six separate occasions, accepted $30.00 in FSP benefits in exchange for cash in the amount of $30.00 over the course of

two occasions. Identification information ascertained from the investigation indicates that these violative transactions were handled by an unidentified female clerk.

As a result of evidence compiled from this investigation, the Field Office informed Appellant in a letter dated October, 10, 2007 that the firm was charged with violating the terms and conditions of the FSP regulations, 7 CFR §278.2(a).

In an in-person meeting on November 5, 2007, Appellant replied to the charges, indicating, in part, that the clerk encountered during the investigation knew that it was against the rules to sell ineligible nonfood items or exchange cash for Food Stamp benefits an that she may have only been trying to please the customer.

After giving consideration to the evidence and Appellant's reply, the Field Office informed Appellant, by letter dated November 14, 2007, that Asafo Market was permanently disqualified from participation as a retail store in the FSP.

In a letter received November 26, 2007, Appellant appealed the Field Office's assessment and requested an administrative review of this action. The appeal was granted.

## ANALYSIS AND FINDINGS

In administrative proceedings involving disputes of regulatory actions or inactions, USDA assumes the responsibility of establishing a sufficient factual record to prove or disprove the allegations of the appeal. The record is then reviewed in light of the evidentiary standards and analytical frameworks established by various courts of law.

In appeals of adverse actions, Appellant bears the burden of proving by a clear preponderance of the evidence, that the administrative actions should be reversed. That means Appellant has the burden of providing relevant evidence which a reasonable mind, considering the record as a whole, might accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.

### I

The controlling statute in this matter is contained in the Food Stamp Act of 1977, as amended, 7 U.S.C. §2021 and 278 of Title 7 of the Code of Federal Regulations (CFR). Part 278.6(e)(1)(i) establishes the authority upon which a permanent disqualification may be imposed against a retail food store or wholesale food concern in the event that personnel of the firm have engaged in trafficking of Food Stamp benefits.

7 CFR §278.6(e)(1)(i) reads, in part, "FNS shall disqualify a firm permanently if personnel of the firm have trafficked as defined in § 271.2." Trafficking is defined, in part, in 7 CFR §271.2, as "the buying or selling of Food Stamp coupons or other benefit instruments for cash or consideration other than eligible food."

# II

On review, Appellant's contentions in the matter are essentially the following:

- The worker who committed violations, despite being trained that EBT is strictly for use for the purchase of eligible food items only, was careless and lazy in her actions and was reprimanded. The worker is no longer employed with the store;
- Appellant was not aware of the violations and does not condone such activity;
- Permanent disqualification is too harsh of a penalty considering this is a first time offense; Request is made that the penalty be lessened; and,
- Permanent disqualification has caused economic hardship to Appellant's business.

With regards to Appellant's contention that she was not aware nor condoned the actions of her employee, who committed violations of the FSP because of carelessness and laziness despite being trained that EBT is strictly for use for purchases of eligible food items only, this contention cannot be accepted as a valid basis for dismissing any of the charges, or for mitigating the impact of those charges. Even if it was not Appellant who violated program regulations, as owner of the store, Appellant is liable for all violative transactions handled by store personnel. Regardless of whom the ownership of a store may utilize to handle store business, ownership is accountable for the proper handling of FSP benefit transactions. Appellant's contention that she did not know of any violations of program regulations at the store cannot be accepted as a valid basis for diminishing the penalty. To allow store ownership to disclaim accountability for the acts of persons whom the ownership chooses to utilize to handle store business would render virtually meaningless the enforcement provisions of the Food Stamp Act and the enforcement efforts of the USDA.

Regarding Appellant's contention that the worker who committed violations was reprimanded and no longer is employed with the store, it is important to clarify that the purpose of this review is to either validate or to invalidate the earlier decision of the Field Office. This review is limited to what circumstances were at the basis of the Field Office action at the time such action was made. It is not the purpose of this review to consider what subsequent remedial actions may be proposed so that a store may begin to comply with program requirements. There is no provision in the FSP regulations or internal agency policy directives for waiver or reduction of an administrative penalty assessment on the basis of after-the-fact corrective action implemented subsequent to investigative findings of program violations. Therefore, Appellant's contention that she has and will take corrective actions does not provide any valid basis for dismissing the charges or for mitigating the penalty imposed.

With regards to Appellant's contention that permanent disqualification would be too harsh of a punishment considering this is a first time offense, a record of participation in the FSP with no previously documented instance of violations does not constitute valid grounds for dismissal of the current charges of violations or for mitigating the impact of those charges. Neither the Food Stamp Act of 1977, as amended, nor the regulations issued pursuant thereto provide for discretion in cases involving trafficking violations. The Act, reads, in part, that disqualification *shall* be "permanent upon ... the *first*

_occasion_ of a disqualification based on ... trafficking ... by a retail food store." (Emphasis added.)

Regarding Appellant's contention that permanent disqualification has caused economic hardship to her firm, it is recognized that economic hardship is a likely consequence whenever a store is permanently disqualified from participation in the FSP. However, consideration must be given to the interests of the program and fairness and equity, not only to competing stores but also to those other participating retailers who are complying fully with program regulations. In addition, fairness must be afforded to those other retailers who have been disqualified from the program in the past for similar violations.

## CONCLUSION

Based on a review of the evidence in this case, it appears that the program violations at issue did, in fact, occur as charged. As noted previously, the charges of violations are based on the findings of a formal USDA investigation. All transactions cited in the letter of charges were conducted by a USDA investigator and all are thoroughly documented. A review of this documentation has yielded no indication of error or discrepancy in any of the reported findings. Rather, the investigative record is specific and accurate with regard to the dates of the violations, the specific ineligible merchandise sold in exchange for FSP benefits, the exchange of FSP benefits for cash, and in all other critically pertinent detail.

Based on the discussion above, the decision to impose a permanent disqualification against Asafo Market is sustained.

## RIGHTS AND REMEDIES

Your attention is called to Section 14 of the Food Stamp Act (7 U.S.C. 2023) and to Section 279.7 of the Regulations (7 CFR §279.7) with respect to your right to a judicial review of this determination. Please note that if a judicial review is desired, the Complaint, naming the United States as the defendant, must be filed in the U.S. District Court for the district in which you reside or are engaged in business, or in any court of record of the State having competent jurisdiction. If any Complaint is filed, it must be filed within thirty (30) days of receipt of this Decision.

Under the Freedom of Information Act (FOIA), it may be necessary to release this document and related correspondence and records upon request. If we receive such a request, we will seek to protect, to the extent provided by law, personal information that if released, could constitute and unwarranted invasion of privacy.

JERRY A. MASEFIELD
ADMINISTRATIVE REVIEW OFFICER

JAN 22 2008
_____
DATE

4



**USDA** United States Department of Agriculture
**Food and Nutrition Service**

United States
Department of
Agriculture

Food and Nutrition
Service

Mid-Atlantic Region

Towson
Field Office

515 E. Joppa Road
Suite 208
Towson, MD
21286-5418

10-779-7097

January 24, 2008

Philomena Afum, Owner
ASAFO Market
1309 Fifth St NE
Stand Numbers 39 and 40
Washington DC 20002

Dear Mrs. Afum:

On January 23, 2008, you received a notice of determination from Jerry A. Masefield the Food Stamp Program (FSP) Administrative Review Officer who reviewed your case. This notice informed you that the PERMANENT disqualification of your firm, ASAFO Market, which became effective on November 16, 2007, has been sustained. This letter is to confirm November 16, 2007 as the effective date of your firm's PERMANENT disqualification.

If you have not already done so, your authorization card, number 0079513, and all other official material relating to the FSP must be mailed immediately to: Sarah A. Duncan, Officer-In-Charge (OIC), United States Department of Agriculture (USDA), Food and Nutrition Service (FNS), Towson Field Office (TFO), 515 E. Joppa Road, Suite 208, Towson, MD. 21286.

Furthermore, under Section 278.6 (f)(2) of the FSP regulations, in the event that you sell or transfer ownership of ASAFO Market, you will be subject to and liable for a Civil Money Penalty (CMP). The CMP shall be double the penalty for a ten year disqualification period, to be calculated using the method found at 278.6(g).

The option to request Judicial Review of this decision is outlined in subpart B, section 279.7 of the enclosed FSP regulations. If a Judicial Review is desired, a firm aggrieved by the determination of the Administrative Review Officer may obtain Judicial Review of the determination by filing a complaint against the United States in the United States district court for the district in which the owner resides, or is engaged in business, or in any court of record of the State having competent jurisdiction.

The complaint must be filed within 30 days after the date of delivery or service upon the firm of the notice of determination of the Administrative Review Officer. Otherwise, in accordance with Section 279.8(e) of the FSP regulations, the determination shall be final. In accordance with Section 279.10(d) of the FSP regulations, if the PERMANENT disqualification of your firm is later reversed through Judicial Review, the USDA shall not be liable for the value of any sales lost during the period of disqualification you served.

The Food and Nutrition Service is an agency
of the Department of Agriculture

An Equal Opportunity Provider and Employer



EXHIBIT

9

This determination shall not preclude the USDA, or any other agency or department of the United States, from taking further action to collect any claim determined under the regulations governing the FSP, or under any other pertinent statutes or regulations, nor shall this determination preclude prosecution under any applicable penal statutes.

Sincerely,

SARAH A. DUNCAN
Officer in Charge
Towson Field Office

Case Number: C0113519

Enclosures

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                          )
PHILOMENA AFFUM                                           )
d/b/a Asafo Market,                                       )
                                                          )
                    Plaintiff,                            )
                                                          )
            v.                                            )        Civil Action No. 08-300 (RCL)
                                                          )
UNITED STATES OF AMERICA                                  )
and ED SCHAFER,                                           )
                                                          )
                    Defendants.                           )
_____)

## **ORDER**

Upon consideration of plaintiff's application for stay of administrative action and for preliminary injunction, it is hereby ORDERED:

1.  the application is granted; and

2.  the permanent disqualification of plaintiff from participation in the federal food stamp program is hereby stayed for the pendency of this action, including any appeal; and

3.  the Secretary of Agriculture shall immediately restore plaintiff to full participation in the federal food stamp program.

This _____ day of _____, 2008.


                                                   _____
                                                   Royce C. Lamberth
                                                   United States District Judge